UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
IVAN and MELANIE KAIL, individually
and on behalf of all others
similarly situated,

                Plaintiffs,          <u>MEMORANDUM & ORDER</u>
                                      15-CV-3513(JS)(GRB)

       -against-

WOLF APPLIANCE, INC.,

                Defendant.
----------------------------------X
APPEARANCES:
For Plaintiffs:     Mark S. Reich, Esq.
                Vincent Michael Serra, Esq.
                Robbins Geller Rudman & Dowd, LLP
                58 South Service Road, Suite 200
                Melville, New York 11747

For Defendant:     Douglas Scott Heffer, Esq.
                Yonaton Aronoff, Esq.
                Anne Berkowitz Sekel, Esq.
                Foley & Lardner LLP
                90 Park Avenue
                New York, New York 10016

                Gordon Davenport, Esq.
                Foley & Lardner LLP
                150 East Gilman Street
                Madison, Wisconsin 53703

                Max B. Chester, Esq.
                Foley & Lardner LLP
                777 East Wisconsin Avenue
                Milwaukee, Wisconsin 53202

SEYBERT, District Judge:

        Defendant Wolf Appliances, Inc. manufactures high-end

cooking appliances, including dual fuel ranges, which combine

gas cooktop burners with electric ovens underneath.  Plaintiffs

Ivan and Melanie Kail have owned a Wolf range since 2006. For the last eight years, however, the Kails received at least ten replacement parts and units to address cosmetic issues with the interior of the oven: Whenever the couple used the self-cleaning function, the oven liner chipped and cracked. Under the two-year limited warranty, which came with the original unit and restarted with each replacement, Wolf covered all parts and labor for any part of the product. But Wolf alleges, and the Kails dispute, that in 2014, the parties agreed to modify the warranty to exclude any cosmetic-related damages. After the chipping continued, the Kails requested a new replacement. Under the terms of the allegedly modified warranty, Wolf declined, and so the Kails filed this proposed class action.

Wolf now asks for summary judgment. (Docket Entry 24.) For the following reasons, Wolf's motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND

The Court will begin with a general overview, amplifying the facts in the analysis to come.[1] As with all

---

[1] Citations are as follows: the Kails' 56.1 Counterstatement (Pls.' 56.1 Counterstmt., Docket Entry 24-3); Ivan Kail's Deposition Testimony (Ivan Tr., Docket Entry 24-4); a March 2014 letter detailing the warranty modification (Mar. 2014 Ltr., Docket Entry 24-5); Melanie Kail's Deposition Testimony (Melanie's Tr., Docket Entry 24-9); Stephanie Stetson's Declaration (Stetson Decl., Docket Entry 24-12); Def.'s customer service database (Docket Entry 24-13); Wolf's standard warranty

summary judgment motions, the Court construes the facts in the light most favorable to the non-moving parties, and all inferences and ambiguities are drawn in their favor. <u>Capobianco v. City of N.Y.</u>, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

I.   <u>Factual Background</u>

In the fall of 2006, the Kails acquired their first Wolf range as a gift from Ivan's employer. (Pls.' 56.1 Counterstmt. ¶¶ 2-3.)   Melanie assumed the primary role in selecting the specific model.[2]   (<u>Id.</u> ¶¶ 3, 5.)   One deciding factor was the cobalt blue porcelain finish that coats the interior of the oven.   (Ivan Tr. 50:3-9; Melanie Tr. 22:7-11; <u>see also</u> Nov. 2002 Press Release at 1.)   As a signature aesthetic, Wolf says, the porcelain will "enhance the oven's interior, creating a bold cooking backdrop." (http://www.subzero-wolf.com/wolf/ranges/dual-fuel/36-inch-dual-fuel-range-4-burners-infrared-charbroiler (as last visited August 16, 2017).)   Unfortunately, the porcelain cracked and

_____

for its 2006 products (Ltd. Warranty, Docket Entry 24-14); a Wolf press release dated November 13, 2012 (Nov. 2012 Press Release, Docket Entry 28-5); excerpts of Stetson's Deposition testimony (Stetson Tr., Docket Entry 28-6); a letter between Ivan Kail and a Wolf representative dated August 18, 2009 (Aug. 2009 Ltr., Docket Entry 28-7); Defendant's Brief (Def.'s Br., Docket Entry 24-1); Plaintiffs' Opposition Brief (Pls.' Br., Docket Entry 27); and Defendant's Reply Brief (Def.'s Reply Br., Docket Entry 31).

[2] To avoid confusion, the Court occasionally refers to the plaintiffs as Ivan and Melanie.  No disrespect is intended.

chipped whenever the couple used the range's self-cleaning feature.[3] (Melanie Tr. 137:14-24.)

Between 2006 and 2014, the Kails received at least three replacements units: (1) a paid upgrade in September 2009; (2) a free replacement in March 2012, and (3) a free replacement in the spring of 2014.[4] (Stetson Decl. ¶ 4.) The Kails also received replacement liners in January 2007, May 2007, September 2008, July 2010, August 2010, and December 2012. (Id.) As this pattern emerged, Wolf offered a cosmetic allowance of $500 or a buyback of the unit, but with the exception of the 2009 upgrade, the Kails "always opted for exchanging or replacing the units." (Pls.' 56.1 Counterstmt. ¶ 40 (brackets and quotation marks omitted).)

Each replacement unit (as opposed to replacement parts) came with a new warranty. (Ltd. Warranty.)[5] Under its full two-year warranty, Wolf "covers all parts and labor to repair or replace any part of the product that proves to be

---

[3] The Kails describe the issue as "peeling," "crack[s]," "complete spidering everywhere," and "complete enamel coming off." (Pls.' 56.1 Counterstmt. ¶ 26.)

[4] The upgraded model and its replacements contained the same blue porcelain interior.

[5] The cited warranty accompanied Wolf's products in 2006, but "later versions of the written warranty contained the same two-year 'repair or replace' language." (Stetson Decl. ¶ 7.)

defective in materials or workmanship" from the date the unit is installed. (Id.)

Two of the replacement units require particular attention. First, in late September 2009, the Kails paid $500 to upgrade their range from a 36-inch model to a 48-inch model. (Stetson Decl. ¶ 6.) Ivan has "a recollection of some sort of a dialogue" with an unidentified Wolf employee over the decision to upgrade. Without recalling the exact verbiage, Ivan paraphrased the conversation: "[T]hey don't believe that this issue we were having in the small unit would happen in a larger unit." (Ivan Tr. 151:14–152:13, 155:19–156:8.) The representative sent a letter memorializing this conversation, which required a countersignature "indicating [Ivan's] acceptance." (Aug. 2009 Ltr. at 1.)

Second, in the spring of 2014, the Kails received their most recent replacement. (Pls.' 56.1 Counterstmt. ¶ 43.) Matthew Heitmann, a Wolf customer service representative, advised the Kails that if they accepted the new replacement, its warranty would not cover any future porcelain damage. (Ivan Tr. 61:3–62:13, 163:19–23.) This was explained to Ivan via telephone and then memorialized in a follow-up letter dated March 14, 2014. Here is what that letter says, in pertinent part:

> This letter is to confirm our conversation
> regarding a No Charge Replacement of your
> unit . . . . We appreciate your patience
> while we work to provide you with a brand
> new unit as quickly as possible. <u>Please
> note that no further product exchanges will
> occur on this replacement unit due to
> porcelain issues. We will also not repair
> any porcelain crazing or chipping on the new
> product.</u>

(Mar. 2014 Ltr. (emphasis in original).) In his deposition testimony, Ivan recalled the conversation and acknowledged that he received the letter. (Ivan Tr. 166:9-167:2.)

In any event, Stephanie Stetson, a Wolf Customer Service Manager, has explained that warranty modifications are apparently a rare occurrence at Wolf. It is unclear whether your standard customer service representative has the authority to modify warranties on behalf of Wolf. (Stetson Tr. 138:24-139:4.) At the very least, the Director of Customer Service, Steve Zimmerschied, would be involved in that process. (Id. 135:2-6.) Based on the present record, there is no indication that he was. (Id. 137:7-138:17.)

Nevertheless, the porcelain continued to chip, and in 2015, the Kails complained to Wolf, which declined to provide another replacement under the terms of the allegedly modified warranty. (Stetson Decl. ¶ 9.) The Kails continue to use their range but are unhappy with the cosmetic issues. (Pls.' 56.1 Counterstmt. ¶ 49.)

## II.  Procedural History

On June 16, 2015, the Kails filed this lawsuit on behalf of themselves and other nationwide Wolf customers.[6]  In it, they assert claims against Wolf for: (1) breach of express and implied warranties under state law and the Magnuson-Moss Warranty Act ("MMWA" or the "Act"), 15 U.S.C. § 2301 et seq.; (2) negligent misrepresentation; and (3) deceptive practices and false advertising under New York General Business Law, §§ 349, 350.  (Compl., Docket Entry 1, ¶¶ 16-17.)

On October 17, 2016, Wolf moved for summary judgment. (Docket Entry 24.)  Discovery was stayed between October 7, 2016 and May 17, 2017.  (Minute Entry 23.)

## DISCUSSION

## I.  Standard of Review

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Coppola v.

---

[6] The Court need not reach the class-certification issue before addressing the merits of this motion.  See Boykin v. 1 Prospect Park ALF, LLC, 993 F. Supp. 2d 264, 283 (E.D.N.Y. 2014) (citing Schweizer v. Trans Union Corp., 136 F.3d 233, 239 (2d Cir. 1998)).

Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.

2505, 2510, 91 L. Ed. 2d 202 (1986)).

II. Warranty-Based Claims

As a general matter, the range at issue is the Kails'

2014 replacement. (See Pls.' Br. at 24-25.)  With that in mind,

the Court will begin by analyzing the warranty-based claims: (1)

breach of the written warranty, (2) breach of any express

warranties created by affirmations of fact or promises, (3)

breach of the implied warranty of merchantability, and (4)

violation of the MMWA.

A. The Written Warranty

A "claim for breach of express warranty requires proof

that an express warranty existed, was breached, and that

plaintiff had relied on that warranty."  Reed v. Pfizer, 839 F.

Supp. 2d 571, 578 (E.D.N.Y. 2012).  "Under New York law, a

seller may extend or exclude express and/or implied warranties."

Jackson v. Eddy's LI RV Ctr., Inc., 845 F. Supp. 2d 523, 530

(E.D.N.Y. 2012).  Wolf's standard warranty "covers all parts and

labor to repair or replace any part of the product that proves

to be defective in materials or workmanship."  (Ltd. Warranty

at 1.)  But Ivan, Wolf says, accepted a modified warranty that

excluded any porcelain issues.  (Def.'s Reply Br. at 8.)

To begin, the Kails frame some of their arguments in terms of preexisting legal obligations and improper contractual modifications. (Pls.' Br. at 11–13.) Those arguments confuse the issue, however, because each free-of-charge replacement, including the 2014 unit, came with a new warranty. In other words, a new warranty means a new contract.[7]

Shifting back to Wolf's argument, it is true that Ivan spoke with Matthew Heitmann and acknowledged a letter memorializing their conversation. (Ivan Tr. 61:3–62:13, 163:19–23, 166:9–167:2.) But whether Heitmann had the authority to modify Wolf's standard warranty is an issue of fact, as demonstrated by the following colloquy with a Wolf Customer Service Manager:

> Q: If a modification needs to be made to the warranty, do you know who makes that or who determines to make that?
>
> A: Steve Zimmerschied would be part of that process. I don't know who would make the final determination.
>
> \* \* \*
>
> Q: [Matt Heitmann's] the one that made the decision to send the letter?
>
> A: Based on the information that I have here, Matt [Heitmann] made the

---

[7] In any event, the Statute of Frauds, N.Y. U.C.C. § 2-201(1), would not apply because the 2014 replacement range does not arise from a "sale of goods for the price of $500 or more." (See Pls.' Br. at 18 n.19.)

> decision. Whether he contacted another individual, I don't know.
>
>               *   *   *
>
> Q: Would a letter like this typically have to be cleared by somebody above Mr. Heitmann's level at Wolf?
>
> A: This isn't a typical letter, so I don't know whether -- I don't think we would have a procedure of what would have to be covered, I mean whether he would have to talk to somebody else.

(Stetson Tr. 135:2-6, 137:18-19, 138:15-17 (internal form objections omitted).) This evidence would entitle a reasonable juror to question whether the warranty modification was enforceable.[8] Neither Zimmerschied nor Heitmann have been deposed to provide any clarification. On top of this, Wolf required a countersignature when the Kails upgraded their range in 2009. Drawing all inferences in the Kails' favor, as the Court must, it is unclear whether Wolf routinely requires a countersignature in the course of its business. (Aug. 2009 Ltr.) Without Zimmerschied's testimony or further explanation on Wolf's modification procedures, the Court must deny summary judgment on the breach of the written warranty claim.

---

[8] Wolf maintains an internal database for customer service calls, including the one between Ivan and Heitmann. These sparse notes do not indicate whether Zimmerschied approved the warranty modification. (See Def.s' Customer Service Database at 2.)

B. <u>Express Warranties Created by Affirmations or Promises</u>

As a creature of contract law, express warranties include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y. U.C.C. § 2-313(1)(a). But nothing in the record indicates that Wolf made any new statements in connection with the 2014 replacement range. (<u>See</u> Melanie Tr. 155:7-11 ("Q: And again, for all of these replacements, there were no new advertisements or anything like that that you looked at, brochures? A: No, sir.") (internal form objection omitted).) Any affirmations or statements relate to the initial purchase in 2006 or the paid upgrade in 2009. (<u>See</u> Stetson Decl. ¶¶ 3-4.) Wolf argues that claims based on these units are barred by the statute of limitations. (Def.'s Reply Br. at 6.) The Court agrees.

For a breach-of-warranty claim, the statute of limitations is four years. <u>Statler v. Dell, Inc.</u>, 775 F. Supp. 2d 474, 481 (E.D.N.Y. 2011). The clock "begins to run 'on tender of delivery,'" not when the plaintiff discovers the defect. <u>Id.</u> When, as here, the delivery method has not been altered, a "tender of delivery . . . occurs when the seller physically delivers the goods." <u>St. Anne-Nackawic Pulp Co. Ltd. v. Research-Cottrell, Inc.</u>, 788 F. Supp. 729, 734 (S.D.N.Y. 1992).

The Kails filed their lawsuit in 2015, making any claims based on the 2006 and 2009 units untimely. Despite the slew of replacement parts and units, "the law is clear that attempts to repair a warrantied product, within the warranty period, do not toll the four[-]year limitations period." Statler, 775 F. Supp. 2d at 482. No other tolling exceptions apply.[9]

The three cases cited by the Kails do not change this outcome. (See Pls.' Br. at 13 n.12, 25.) First, in Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F.2d 456 (4th Cir. 1983), the Fourth Circuit applied Maryland law to conclude, contrary to New York law, that replacement goods "carried their own limitations period." Id. at 463. Next, in Alstom Power, Inc. v. Schwing Am., Inc., No. 04-CV-1311, 2006 WL 2642412 (D. Conn. Sept. 14, 2006), the replacement parts were not defective, so the court determined that the warranty period ran "upon tender of the original parts." Id. at *5 n.9. Finally, in Camillo v. Olympia & York Properties Co., 157 A.D.2d 34, 554 N.Y.S.2d 532 (1st Dep't 1990), the court avoided the issue at hand because the breach-of-warranty claims would have been time-

---

[9] Although the discovery rule is generally inapplicable, there is a future-performance exception for express warranties. "[W]here a warranty explicitly extends to future performance of the goods . . . the cause of action accrues when the breach is or should have been discovered." N.Y. U.C.C. § 2-725(2). But the record lacks any mention of such guarantees.

barred even if the limitations period began with the replacement goods.  Id. at 40–45, 554 N.Y.S.2d at 533–37.  Thus, any claims based on express warranties made through affirmations of fact or promises are time-barred.

C. Implied Warranty of Merchantability

Wolf also asks for summary judgment on the implied warranty claim, raising three arguments: (1) the claim is untimely based on the four-year statute of limitations because there was no sale transaction for the 2014 replacement range, (Def.'s Br. at 12–14); (2) the Kails lack privity with Wolf, in part, because Ivan's employer purchased the original range in 2006, (id. at 15); and (3) it is undisputed that the ranges are merchantable because the issue is cosmetic, not functional, (id. at 10–12).  As a quick primer, contracts of sale contain an implied warranty of merchantability when, as here, "the seller is a merchant with respect to goods of that kind."  N.Y. U.C.C. § 2-314(1).  Goods are merchantable if they are, among other things, "fit for the ordinary purposes for which such goods are used."  Id. § 2-314(2)(c).

Beginning with Wolf's first argument, Article 2 of the UCC "applies to transactions in goods."  Id. § 2-102.  So an implied warranty of merchantability arises in a contract of sale, which "includes both a present sale of goods and a contract to sell goods at a future time."  Id. §§ 2-106(1).

13

Gifts would then fall outside of Article 2, but some courts have found that a combined offering of a free good and a purchased good would receive an implied warranty. See, e.g., E.I. du Pont De Nemours & Co., Inc. v. Kaufman & Chernick, Inc., 337 Mass. 216, 220, 148 N.E.2d 634, 636 (1958) (free anti-freeze after purchasing tires because "the purchaser received the 'gift' only in connection with the purchase of another item"); Levondosky v. Marina Assocs., 731 F. Supp. 1210, 1213 (D.N.J. 1990) (free drinks after purchasing gambling chips because the casino was "not offering these drinks out of any sense of hospitality or charity"); Gunning v. Small Feast Caterers, Inc., 4 Misc. 3d 209, 212, 777 N.Y.S.2d 268, 271 (Sup. Ct., Kings Cty., 2004) (adopting Levondosky's analysis and concluding that a "restaurant impliedly warranted that the water it served . . . was fit for consumption").

Although the Second Circuit has not considered this specific scenario, the First Circuit considered an analogous argument in Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197 (1st Cir. 2004).[10]  In that case, a windows manufacturer provided

---

[10] Neither side briefed this issue, but as a catch-all, the Kails urge that if the breach-of-the-written-warranty claim survives summary judgment, "the rest of [Wolf's] arguments fall like dominos."  (Pls.' Br. at 10; see also id. at 24 ("The oven at issue in this litigation was delivered to Plaintiffs on April 2, 2014. . . . That oven was delivered within the [written warranty]. . . . And with these two facts taken as true, Plaintiff's claims are timely.").)  But those blanket statements

replacements windows after the warranty period had expired.  Id.
at 200-01.  Soon after, an inspector concluded that several
windows, including some of the newly installed windows, were
damaged.  Id. at 200.  The buyers requested new windows for
free, but the seller declined and offered replacement windows
only at a discounted price.  Id.  The buyers filed suit, arguing
that the newly installed windows "should be replaced because
they came with implied warranties."  Id. at 205.

The First Circuit concluded that "the replacement
windows are more akin to a gift and that thus there was no
implied warranty on the windows."  Id.  Although a free good
could be deemed a sale, the court determined that "[i]n such a
situation, the free good is provided in a package with the paid
for good," such as the examples above: free anti-freeze with
tires or free beverages with gambling chips.  Id.  Because "the
replacement windows were not coupled with any other
transaction," there was no implied warranty protection.  Id.

Turning to the case at hand, it is undisputed that the
2014 replacement unit was not packaged with a purchase.  Unlike
the Neuhoff warranty, however, there is a genuine issue of
material fact about whether the Kails' warranty had expired.
With the exception of the allegedly modified warranty described

---

are unavailing because the claims require proof of different
elements.

above, any cosmetic-related damages were covered by Wolf's full two-year warranty. (Ltd. Warranty.) The parties agree that the Kails received a replacement range on March 9, 2012 and April 2, 2014. (Pls.' Br. at 6–7 (citing Stetson Decl. ¶ 4).) The warranty of the March 9, 2012 replacement expired on March 9, 2014, which could turn the April 2, 2014 replacement into a gift. But the Complaint asserts that "[i]n October 2013, Wolf replaced the March 2012 oven with a similar 48-inch range." (Compl. ¶ 51.) Ivan recalls this replacement; Melanie does not. (Ivan Tr. 162:5–8; Melanie Tr. 155:2–4.) In their briefs, both parties fail to reference this replacement range. (Def.'s Reply Br. at 4 (describing the warranty agreement on the March 2012 range as "the last warranty in which Wolf agreed to cover porcelain issues"); Pls.' Br. at 5–7 (chronicling the replacement units but omitting the October 2013 range).) Taking Ivan's word for it, as the Court must, there is an issue of fact about whether the Kails received an October 2013 replacement range. If they did receive such a range, the warranty period did not lapse when Wolf provided the Kails with the 2014 replacement range.

Wolf's second argument is that "the lack of privity provides an additional, independent reason for dismissing the implied warranty claim to the extent it is based on the 2006 sale." (Def.'s Br. at 15.) Without going any further, the

Court can reject this argument because the range at issue is based on the 2014 replacement.[11]  (See Pls.' Br. at 24-25.)

The Court now turns to the final argument: whether there is a genuine issue of material fact that the 2014 range was merchantable.  To meet that definition, goods must be, among other things, "fit for the ordinary purposes for which such goods are used."  N.Y. U.C.C. § 2-314(2)(c).  Of course, "goods do not have to fulfill every expectation of the buyer." Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422, 449 (W.D.N.Y. 2001).  But at the same time, they must do "'what they were supposed to do for as long as they were supposed to do it.'" Id. (quoting Groome v. Matsushita Elec. Corp. of Am., No. 92-CV-3073, 2000 WL 341134, at *6 (E.D.N.Y. Mar. 30, 2000)).  Goods may serve aesthetic functions and non-aesthetic functions. Dental veneers and paint products, for example, are cosmetic by nature.  See, e.g., Golden v. Den-Mat Corp., 47 Kan. App. 2d 488, 489, 276 P.3d 773, 798-99 (2012); AutoZone, Inc. v. Glidden Co., 737 F. Supp. 2d 936, 949 (W.D. Tenn. 2010).  On the other hand, a car has a non-aesthetic purpose: transportation.  But even if the car is fit for a daily commute or a cross-country road trip, it may still violate the implied warranty of merchantability if the car "smells, lurches, clanks, and emits

---

[11] Wolf, on the other hand, impliedly concedes that the 2009 upgrade does constitute a transaction between the Kails and Wolf.  (See Def.'s Br. at 15.)

smoke over an extended period of time." See Isip v. Mercedes-Benz USA, LLC, 155 Cal. App. 4th 19, 27, 65 Cal. Rptr. 3d 695, 700 (Cal. App. 2007). Or said another way, cosmetic damages may affect the functionality of the good. Cf. Carey v. Chaparral Boats, Inc., 514 F. Supp. 2d 1152, 1155-56 (D. Minn. 2007) (granting summary judgment because "the overwhelming evidence demonstrate[d] that the cracks in the boat's finish are a cosmetic problem and in no way impact the boat's ordinary use").

Here, the ordinary purpose of a Wolf range is to cook food. Although the Kails continue to use their range, it is unclear whether chipped porcelain contaminates food cooked in the oven. See Stearns v. Select Comfort Retail Corp., No. 08-CV-2746, 2009 WL 1635931, at *8 (N.D. Cal. June 5, 2009) ("The fact that a person still may sleep on a moldy bed does not bar as a matter of law a claim for breach of the implied warranty of merchantability."). Take Ivan's deposition testimony:

> Q:   When you say there was an issue with the cavity, what are you referring to?
>
> A:   The blue cavity chipping or peeling or spidering and particles flying around in the oven, yes.

(Ivan Tr. 80:9-13) (emphasis added). Put another way, the durability of the porcelain may affect the functionality of the oven. After using the self-clean function, porcelain pieces may fly onto the food, and so the range may be incapable of being

cleaned, thus preventing the Kails from using it. Accordingly, the Court denies summary judgment on the implied warranty claim.

D. <u>Magnuson-Moss Warranty Act</u>

As the federal "lemon law," the MMWA is "designed to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." <u>Pyskaty v. Wide World of Cars, LLC</u>, 856 F.3d 216 (2d. Cir. 2017) (internal quotation marks and citation omitted). "The MMWA, however, creates no additional bases for liability, but allows a consumer to recover damages under existing state law, and attorneys' fees." <u>Diaz v. Paragon Motors of Woodside, Inc.</u>, 424 F. Supp. 2d 519, 540 (E.D.N.Y. 2006). In that regard, "claims under the [Act] stand or fall with the express and implied warranty claims under state law." <u>Cali v. Chrysler Grp. LLC</u>, No. 10-CV-7606, 2011 WL 383952, at *4 (S.D.N.Y. Jan. 18, 2011) (internal quotation marks and citation omitted). Because there are issues of fact on the written-warranty and implied-warranty claims, the MMWA claim must move forward.

III. <u>Negligent Misrepresentation Claim</u>

Next, the Court turns to the Kails' negligent misrepresentation claim, which requires proof of five factors: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant

made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." See Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

The economic loss doctrine limits recovery for personal injury or property damage. EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 277 (S.D.N.Y. 2004). So "if an alleged product malfunction is alleged to have caused purely economic loss, then the end-purchaser is limited to contract claims against the manufacturer and may not seek damages in tort." Id. (citing Schiavone Constr. Co. v. Elgood Mayo Corp., 56 N.Y.2d 667, 669, 436 N.E.2d 1322, 1323, 451 N.Y.S.2d 720 (1982)). Here, it is undisputed that the damages sought are remediable in contract, and so the economic loss doctrine might apply. (See Pls.' 56.1 Counterstmt. ¶ 30.)

If, however, the parties enjoyed a "special relationship," the plaintiff can overcome the economic loss doctrine. Those Certain Interested Underwriters v. Farley Grp., Nos. 12-CV-0707 & 13-CV-0385, 2015 WL 5602924, at *32 (N.D.N.Y. Sept. 23, 2015). As the Second Circuit has recognized, "whether

a special relationship exists between two parties is an issue of fact." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001). For the purposes of this analysis, a factfinder should weigh three factors simultaneously: (1) "whether the person making the representation held or appeared to hold unique or special expertise"; (2) "whether a special relationship of trust or confidence existed between the parties"; and (3) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Kimmell v. Schaefer, 89 N.Y.2d 257, 264, 675 N.E.2d 450, 454, 652 N.Y.S.2d 715 (1996). New York courts have imposed liability "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Id. at 263, 675 N.E.2d at 454. The plainest examples are lawyers, engineers, and accountants who, "by virtue of their training and expertise, may have special relationships of confidence and trust with their clients." Id. In that sense, an ordinary buyer-seller relationship is insufficient because "a vast majority of commercial transactions are comprised of . . . 'casual' statements and contacts." Id.

But in the commercial context, a special relationship may exist if the parties shared a higher degree of trust and

reliance than that of an ordinary buyer and seller. See Century Pacific, Inc. v. Hilton Hotels Corp., No. 03-CV-8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004). Consider, for example, situations "where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information." Id. (collecting cases).

Applying Kimmell's three-factor inquiry, the Court finds genuine issues of fact that preclude summary judgment. As for the first factor, Wolf, no doubt, possesses special expertise on the quality and operations of its ranges. Second, and crucial to the analysis, the parties shared a relationship that spanned nine years with repeated service calls that yielded at least ten replacement parts and units. Cf. Alley Sports Bar LLC v. SimplexGrinnell LP, 58 F. Supp. 3d 280, 295 (W.D.N.Y. 2014) (rejecting a special-relationship argument at the motion-to-dismiss stage because the parties "engaged in an ordinary business transaction over the course of three days" where a defendant-contractor failed to fix the plaintiff's sprinkler system, which then caused property damage). As for the third factor, a reasonable factfinder could conclude that the Kails relied on Wolf's representations to upgrade their smaller range to a larger model. Ivan, at his sworn deposition, recalled a conversation, in which an unidentified Wolf representative

suggested that the porcelain-chipping issue was limited to Wolf's smaller units. (See, e.g., Ivan Tr. 58:14–18 ("We knew what the product was and we were under the impression that Wolf explained at the time that if we go to a different oven, we should not have these problems that we had in the past. So we agreed to go to a larger oven . . . .").) Thus, there are genuine issues of material fact, precluding summary judgment, about whether the parties enjoyed a closer relationship than that of an ordinary buyer and seller.

IV. <u>Statutory Claims</u>

Finally, Wolf argues that the statutory claims-- alleging violations of New York's deceptive practices and false advertising laws, N.Y. GEN. BUS. L. §§ 349, 350--are untimely. (Def.'s Br. at 22–24.) The Court agrees.

Claims under Sections 349 and 350 have a "three-year statute of limitations." <u>Martin Hilti Family Trust v. Knoedler Gallery, LLC</u>, 137 F. Supp. 3d 430, 466 (S.D.N.Y. 2015). The clock begins to run when the plaintiff is injured, not when the alleged deceptive practice is discovered. <u>Marshall v. Hyundai Motor Am.</u>, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014). In cases like this one, the injury occurs along with the sale transaction because the alleged defect--be it, the functionality of the self-cleaning feature or the durability of the porcelain--was in place when the plaintiffs purchased the product. <u>See</u> <u>id.</u>

at 461-62 (holding that a Section 349 claim was time-barred because "the defective brake systems were in place when all three Plaintiffs purchased their vehicles"); Bristol Vill., Inc. v. Louisiana-Pacific Corp., 170 F. Supp. 3d 488, 499 (W.D.N.Y. 2016) (concluding that a Section 349 claim was untimely because "the [product] was defective when it was purchased, delivered, and installed").

To survive summary judgment under either statute, a plaintiff must show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000); Gristede's Foods, Inc. v. Unkechauge Nation, 532 F. Supp. 2d 439, 451 (E.D.N.Y. 2007) ("Indeed, courts have noted that the standards under both sections are substantively identical."). The issue here is "whether the conduct or advertisements were materially misleading." See Braynina v. TJX Cos., Inc., No. 15-CV-5897, 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016). "A 'material' deception is one involving information that is important to consumers and likely to affect their choice of product." Id. at *5. Today's result is straightforward: Any material omissions or misrepresentations, as described above, relate back to the initial purchase in 2006 or the paid upgrade

in 2009.  (See Stetson Decl. ¶¶ 3-4.)  Thus, summary judgment is granted on the statutory claims.

CONCLUSION

Defendant's motion for summary judgment (Docket Entry 24) is GRANTED IN PART and DENIED IN PART.  As for the 2014 replacement range, four claims will proceed to trial: (1) breach of the written warranty; (2) breach of the implied warranty of merchantability; (3) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.; and (4) negligent misrepresentation.  Before Plaintiffs file a motion for class certification, the Court directs the parties to confer and submit a proposed briefing schedule within twenty (20) days of the date of this Memorandum and Order.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August __21__, 2017
           Central Islip, New York