UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

IVAN and MELANIE KAIL, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiffs,

    vs.

WOLF APPLIANCE, INC.,

        Defendant.

Civil Action No. 2:15-cv-03513-JS-GRB

CLASS ACTION

————————————————————

BARRY GARFINKLE, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

    vs.

WOLF APPLIANCE, INC.,

        Defendant.

Civil Action No. 2:17-cv-03753-JS-GRB

CLASS ACTION

————————————————————

FREDERICK I. SHARP, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

    vs.

WOLF APPLIANCE, INC.,

        Defendant.

Civil Action No. 2:18-cv-01723-JS-GRB

CLASS ACTION

———————————————————— x

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND FOR
APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ......................................................................................................1

II.   SUMMARY OF COMMON FACTS .......................................................................2

      A.    Wolf Manufactures and Sells Ovens Containing the Same Oven Cavities
            (Including Signature Blue Cavities)...............................................................2

      B.    Wolf Promotes Its "Signature" Blue Interiors, Premium Brand and
            Dependability .................................................................................................3

      C.    Wolf's Oven Cavities Chip, Crack, Craze or Otherwise Manifest Uniform
            Imperfections .................................................................................................4

      D.    The Imperfections Have Ancillary and Negative Effects on Consumers'
            Use of Wolf Ovens.........................................................................................7

      E.    Discovery Demonstrates that Wolf Has Been Aware that the Porcelain
            Interior of the Wolf Oven Cavities Will Craze and Form Imperfections ...............8

      F.    Purchasers of Wolf Ovens with Blue Porcelain Interiors Were Uniformly
            Damaged ......................................................................................................10

      G.    Damages Can Be Measured on a Classwide Basis ................................................11

III.  LEGAL STANDARD FOR CLASS CERTIFICATION .........................................12

IV.   THE REQUIREMENTS OF RULE 23(a) ARE READILY MET .................................13

      A.    The Classes Satisfy the Numerosity Requirement.................................................13

      B.    Commonality Is Satisfied...............................................................................13

      C.    Plaintiffs' Claims Are Typical .......................................................................15

      D.    Plaintiffs Will Adequately Represent the Classes ...............................................17

V.    REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(b) ARE
      SATISFIED...............................................................................................................19

      A.    Common Questions of Law or Fact Predominate.................................................20

            1.    Plaintiffs' Claims Are Subject to Classwide Evidence..........................20

            2.    Damages Are Measurable on a Classwide Basis ....................................22

                  a.    Replacement Value of the Wolf Oven Cavities............................23

- i -

**Page**

        b.     Price Premium Damages ..................................................................24

        c.     Statutory Damages ........................................................................27

        d.     "Value Adjustment" of the Defective Cavities ............................29

        e.     Full Compensatory Damages .......................................................29

    B.     Class Litigation Is Superior to Other Methods of Adjudication ...........................30

VI.    THE PROPOSED CLASSES ARE ASCERTAINABLE ...............................................30

VII.   THE REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(b)(2) ARE READILY MET ..........................................................................................................32

VIII.  THIS IS NOT A PRODUCTS DEFECT CASE .............................................................34

IX.    CONCLUSION .............................................................................................................34

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. Hyland's Inc.*,
   300 F.R.D. 643 (C.D. Cal. 2014) ...........................................................................29

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...........................................................................12, 19, 20

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...........................................................................20, 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000)...........................................................................18

*Balderramo v. Go N.Y. Tours, Inc.*,
   No. 15 Civ. 2326, 2017 WL 2819863
   (S.D.N.Y. June 28, 2017)...........................................................................16

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ...........................................................................31

*Blagman v. Apple, Inc.*,
   No. 12 Civ. 5453, 2014 WL 2106489
   (S.D.N.Y. May 19, 2014)...........................................................................14

*Brecher v. Republic of Arg.*,
   806 F.3d 22 (2d Cir. 2015)...........................................................................31

*Briseno v. ConAgra Foods, Inc.*,
   674 F. App'x 654 (9th Cir. 2017) ...........................................................................24

*Broomfield v. Craft Brew Alliance, Inc.*,
   No. 17-cv-01027, 2018 WL 4952519
   (N.D. Cal. Sept. 25, 2018) ...........................................................................24, 25

*Brown v. Hain Celestial Group, Inc.*,
   No. C-11-03082, 2014 WL 6483216
   (N.D. Cal. Nov. 18, 2014)...........................................................................24, 27

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010)...........................................................................19

*Butler v. Sears, Roebuck & Co.*
   702 F.3d 359 (7th Cir. 2012) ...........................................................................12

Page

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ...............................................22

*Caballero by Tong v. Senior Health Partners, Inc.*,
    No. 16 CV 0326, 2018 WL 4210136
    (E.D.N.Y. Sept. 4, 2018).................................................13

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2d Cir. 1999)................................................17

*Civic Ass'n of the Deaf v. Giuliani*,
    915 F. Supp. 622 (S.D.N.Y. 1996) ........................................14

*Clay v. CytoSport, Inc.*,
    No. 3:15-CV-00165, 2018 WL 4283032
    (S.D. Cal. Sept. 7, 2018) ..............................................24, 26

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)................................................ *passim*

*Consol. Rail Corp. v. Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)................................................13

*Cortigiano v. Oceanview Manor Home for Adults*,
    227 F.R.D. 194 (E.D.N.Y. 2005) .........................................13

*Davis v. City of New York*,
    296 F.R.D. 158 (S.D.N.Y. 2013) .........................................33

*Dzielak v. Whirlpool Corp.*,
    No. 12-0089, 2017 WL 1034197
    (D.N.J. Mar. 17, 2017)...................................................24

*Dzielak v. Whirlpool Corp.*,
    No. 2:12-89, 2017 WL 6513347
    (D.N.J. Dec. 20, 2017) ................................................27, 32

*Ebin v. Kangadis Food, Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) .................................. *passim*

*Elkind v. Revlon Consumer Prods. Corp.*,
    No. CV 14-2484, 2017 U.S. Dist. LEXIS 24512
    (E.D.N.Y. Feb. 17, 2017).......................................... *passim*

**Page**

*Enzo Forcellati v. Hyland's Inc.*,
  No. CV 12-1983, 2014 WL 1410264
  (C.D. Cal. Apr. 9, 2014) ........................................................................31

*Falco v. Nissan N. Am., Inc.*,
  No. CV-13-00686, 2016 WL 1327474
  (C.D. Cal. Apr. 5, 2016) ........................................................................23

*Fogarazzao v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ...........................................................15

*Gold v. Lumber Liquidators*,
  323 F.R.D. 280 (N.D. Cal. 2017) ..........................................................23

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
  317 F.R.D. 374 (S.D.N.Y. 2016) ...........................................................13

*Gortat v. Capala Bros., Inc.*,
  No. 07-CV-3629, 2010 WL 1423018
  (E.D.N.Y. Apr. 9, 2010) ........................................................................31

*Gortat v. Capala Bros., Inc.*,
  257 F.R.D. 353 (E.D.N.Y. 2009) .......................................................12, 13

*Guido v. L'Oreal, USA, Inc.*,
  No. 11-cv-01067, 2014 WL 6603730
  (C.D. Cal. July 24, 2014) ...................................................................24, 26

*Guido v. L'Oreal, USA, Inc.*,
  No. CV 11-1067, 2013 WL 3353857
  (C.D. Cal. July 1, 2013) ........................................................................28

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ................................................................................12

*Hernandez v. AutoZone, Inc.*,
  323 F.R.D. 496 (E.D.N.Y. 2018) ...........................................................33

*In re Amla Litig.*,
  No. 16-CV-6593, 2018 WL 5318420
  (S.D.N.Y. Oct. 29, 2018) ...................................................................27, 28

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ......................................................21, 22

**Page**

*In re Arris Cable Modem Consumer Litig.*,
No. 17-CV-01834, 2018 WL 3820619
(N.D. Cal. Aug. 10, 2018) ............................................................................15, 34

*In re Conagra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ...................................................................28

*In re Dial Complete Mktg. & Sales Practices Litig.*,
320 F.R.D. 326 (D.N.H. 2017) .................................................24, 25, 26, 27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)...................................................................................16

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006).............................................................................30, 31

*In re Lenovo Adware Litig.*,
C.A. No. 15-md-02624, 2016 WL 6277245
(N.D. Cal. Oct. 27, 2016) .....................................................................................24

*In re Methyl Tertiary Buyl Ether* ("*MTBE*") *Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) ...................................................................31, 32

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d. 936 (N.D. Cal. 2018) ................................................................25

*In re Myford Touch Consumer Litig.*,
No. 13-CV-03072-EMC, 2016 WL 7734558
(N.D. Cal. Sept. 14, 2016) ...................................................................................27

*In re Nassau County Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006).........................................................................19, 20

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ................................................................ *passim*

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001)................................................................................12

*In re Whirlpool Corp. Front-Loading Waser Prods. Liab. Litig.*,
678 F.3d 409 (6th Cir. 2012) ...............................................................................15

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ...............................................................................30

**Page**

*Khoday v. Symantec Corp.*,
 C.A. No. 11-180, 2014 WL 1281600
 (D. Minn. Mar. 13, 2014) .......................................................................24, 27, 29

*Kurtz v. Kimberly-Clark Corp.*,
 321 F.R.D. 482 (E.D.N.Y. 2017) .........................................................14, 18

*Leider v. Ralfe*,
 No. 01 Civ. 3137, 2004 WL 1773330
 (S.D.N.Y. July 30, 2004) .......................................................................22

*Marisol A.by Forbes v. Giuliani*,
 126 F.3d 372 (2d Cir. 1997) .................................................................12, 13, 14

*Mayhew v. KAS Direct, LLC*,
 No. 16 CV 6981, 2018 WL 3122059
 (S.D.N.Y. June 26, 2018) .......................................................................14, 17, 33

*Mayline Enters., Inc. v. Milea Truck Sales Corp.*,
 641 F. Supp. 2d 304 (S.D.N.Y. 2009) ..................................................28

*Microsoft v. Motorola, Inc.*,
 904 F. Supp. 2d 1109 (W.D. Wa. 2012) ..............................................24, 27

*Moore v. PaineWebber, Inc.*,
 306 F.3d 1247 (2d Cir. 2002) ...............................................................20, 21

*Morales v. Rochdale Vill., Inc.*,
 No. 15-CV-502, 2018 U.S. Dist. LEXIS 131019
 (E.D.N.Y. Aug. 1, 2018) .......................................................................13, 15

*Myers v. Hertz Corp.*,
 624 F.3d 537 (2d Cir. 2010) .................................................................20

*Noble v. 93 Univ. Place Corp.*,
 224 F.R.D. 330 (S.D.N.Y. 2004) ..........................................................31

*Price v. L'Oreal USA, Inc.*,
 No. 17 Civ. 614, 2018 WL 3869896
 (S.D.N.Y. Aug. 15, 2018) .......................................................................*passim*

*Roach v. T.L. Cannon Corp.*,
 778 F.3d 401 (2d Cir. 2015) .................................................................22, 23

Page

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993)..................................................................16

*Sanchez-Knutson v. Ford Motor Company*,
310 F.R.D. 529 (S.D. Fl. 2015)..........................................................24, 26

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)................................................................23, 27

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..................................................................20

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013) ...................................................24

*U.S. v. City of New York*,
276 F.R.D. 22 (E.D.N.Y. 2011) .........................................................14, 20

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)................................................................14, 23, 33

*Yamada D.D.S. v. Nobel Biocare Holding AG*,
275 F.R.D. 573 (C.D. Cal. 2011) ..........................................................23

*Zhang v. Wen Mei, Inc.*,
No. 14-CV-1647, 2017 WL 8813132
(E.D.N.Y. Dec. 28, 2017) ....................................................................16

## STATUTES, RULES AND REGULATIONS

N.Y. General Business Law
§349.............................................................................................27, 28
§349(h)..............................................................................................27

Federal Rules of Civil Procedure
Rule 23 ......................................................................12, 19, 22, 27
Rule 23(a)...................................................................................12, 13
Rule 23(a)(2)...................................................................................14
Rule 23(a)(3)...................................................................................15
Rule 23(a)(4)...............................................................................17, 18
Rule 23(b) ......................................................................................12, 19
Rule 23(b)(2)...........................................................................19, 32, 33
Rule 23(b)(3)............................................................................ *passim*

Plaintiffs Ivan and Melanie Kail, Dr. Barry Garfinkle and Frederick I. Sharp ("Plaintiffs"), respectfully submit this Memorandum of Law in support of their Motion for Class Certification and for Appointment of Class Representatives and Class Counsel.

## I.    INTRODUCTION

Did defendant Wolf Appliance, Inc. ("Wolf" or "Defendant") falsely advertise the aesthetic features of its ovens? Was the marketing of signature aesthetics of the Blue Cavities (defined below) false and misleading? Did Wolf fail to warn consumers that its porcelain oven cavities were prone to manifesting imperfections?[1] This case can be certified under ***any one*** of these[2] uncomplicated questions because each can be answered for all class members in one stroke, without resorting to any individualized evidence. Class certification is therefore appropriate.

Wolf's porcelain oven cavities manifest imperfections or blemishes through regular use of their ovens. For Plaintiffs, and countless other absent class members, the imperfections appeared in the form of cracking or crazing. For certain absent class members, the blemishes have not yet appeared in their ovens. But, according to Wolf, it is only a matter of time before the inevitable crazing will occur. Wolf refuses, however, to take responsibility for the crazing that appears in its customers' ovens. Discovery taken by Plaintiffs thus far[3] revealed not only Wolf's recognition of this recurring and common problem for approximately a decade, but that Wolf has not determined the root cause or remedy to its design or manufacturing process to ensure that the crazing does not

---

[1]    Plaintiffs use the term "imperfections" to describe the chipping, cracking, crazing, flaking and/or spidering of Wolf's porcelain oven interiors discussed herein. Plaintiffs previously used the word "defect" not as a legal definition, but to describe the manifestation of the imperfections or blemishes in Wolf's oven cavities. *See infra*, §VIII, for further discussion on the issue of imperfections verses defects.

[2]    These, and other common questions of fact or law, are discussed below, *infra* §IV.B. p. 13-15, and are set forth in full as Ex. 1. All references to "Ex. ___" are to the Declaration of Vincent M. Serra in Support of Plaintiffs' Motion for Class Certification ("Serra Decl."), submitted herewith.

[3]    The three pending cases are coordinated for the purposes of discovery. *See Kail v. Wolf Appliance, Inc*., Civ. No. 2:15-cv-03513-JS-GRB; *Garfinkle v. Wolf Appliance, Inc*., Civ. No. 2:17-cv-03753-JS-GRB; *Sharp v. Wolf Appliance, Inc*., Civ. No. 2:18-cv-01723-JS-GRB.

continue.  Despite the prevalence of the known crazing problem, and the longevity of the internal

issue at Wolf, Defendant refuses to warn its customers that ordinary or instructed use of the ovens

will cause cracking or crazing to appear in the oven cavities.

Through this motion, Plaintiffs seek to certify classes of purchasers of Wolf Ovens (defined

below) containing porcelain oven interiors that are predisposed to crazing.  Through this action,

Plaintiffs seek damages to compensate purchasers who paid for Wolf's high-end unblemished ovens

with "signature" blue porcelain interiors, and, instead, received something less.  Plaintiffs, and the

class members they seek to represent, are entitled to compensation in the form of a refund of the

oven; the cost of remedying or replacing the cavities with imperfections; or, at a very minimum, the

difference in price between the ovens with versus without the alleged crazing (*e.g.*, the price

premium).  Plaintiffs further seek injunctive relief in the form of a warning that the crazing will

occur so that Wolf is enjoined from continuing the sale of these ovens to unsuspecting consumers.

Because the question of whether Wolf falsely advertised its ovens predominates over any individual

question in this case, and because Plaintiffs can prove this through common evidence, including

expert testimony, Plaintiffs' and the class's claims can be uniformly resolved.  Accordingly, class

certification is warranted.

## II.     SUMMARY OF COMMON FACTS

### A.     Wolf Manufactures and Sells Ovens Containing the Same Oven Cavities (Including Signature Blue Cavities)

Wolf manufactures and sells high-end built-in ovens and ranges with porcelain enameled

oven interiors (the "Wolf Ovens"), including its "signature" cobalt blue porcelain ovens (the "Blue

Ovens" or "Blue Cavities").[4]  Wolf describes and markets itself as a leading manufacturer of high-

---

[4]     Wolf refers to its oven interiors as "cavities."  Wolf's built-in (or "wall") ovens, "dual fuel" ranges (ovens that include a gas cooktop and electric oven), and induction ranges contain blue oven cavities.  The built-in ovens are sold in different series, including the L Series, E Series and M Series models.

end cooking appliances.[5] Wolf's Blue Ovens, for example, retail for between approximately $4,300 and $17,600.[6] Wolf Ovens are designed, manufactured and assembled in the same fashion.[7] Wolf's Blue Ovens are sold in different sizes and configurations, but they all contain the same designed and manufactured cobalt blue porcelain oven cavity.[8] All are equally susceptible to crazing, and either have or will inevitably manifest imperfections.

### B.   Wolf Promotes Its "Signature" Blue Interiors, Premium Brand and Dependability

Wolf advertises its ovens as premium-brand luxury appliances that are both aesthetically pleasing and dependable.[9] The cobalt blue porcelain in the Blue Ovens is a defining product "feature" as part of Wolf's advertised "*signature aesthetics*" to "enhance the oven's interior."[10] Wolf further relies on representations regarding the dependability of its ovens[11] to sell the Blue Ovens (*e.g.*, Wolf's "20 year life goal").[12] And the Company's stated intention for perfection – which it touts to consumers and its customers, who, in turn, come to expect – is intended to apply to

---

[5]   *See* ECF No. 57, Class Action Complaint ("Sharp Cpt."), at ¶8; *see also* ECF No. 1, Class Action Complaint ("Kail Cpt."), at ¶6.  All references to "ECF No. ___" are to the docket in the *Kail* action.

[6]   Ex. 2, WOLF 1208857-976; *see also* Ex. 3 at KAIL0000378-79.

[7]   *E.g.*, Ex. 4, Rinehart Tr. at 189:2-16.

[8]   *See*, *e.g.*, Ex. 4, Rinehart Tr. at 167:4-172:15; 189:2-16.  Likewise, the blue porcelain powder and material used to manufacture Wolf oven cavities has remained constant throughout the Class Period. Ex. 5, Jan. 13, 2016 letter from Y. Aronoff to M. Reich at 2; *see also* Ex. 4, Rinehart Tr. at 67:14-68:4 (explaining that there were no design changes to the porcelain enamel over time); *see also* Ex. 4, Rinehart Tr. at 42:5-12 (explaining that Capron has coated the porcelain cavities "[s]ince the beginning of making Wolf product").

[9]   Sharp Cpt. at ¶¶26, 27, 86; *see also* Ex. 6 at KAIL0000386; Ex. 7, Def's Ex. 10 at KAIL0000389-91; Ex. 8 at WOLF 0023945-46.

[10]   *E.g.*, Sharp Cpt. at ¶86.

[11]   Ex. 7, Def's Ex. 10 at KAIL0000390 (Wolf ovens are "*rigorously tested to ensure dependability*"; "Built with *superior-quality materials*, *Wolf products are designed to last a minimum of 20 years* under far heavier use than any home cook will ever subject them to.  To ensure reliability, engineers stress-test our designs under laboratory conditions that simulate years of use. . .").

[12]   Ex. 9, Dietsch Tr. at 52:15-21.

all facets of Wolf products, including aesthetic features.[13]

### C. Wolf's Oven Cavities Chip, Crack, Craze or Otherwise Manifest Uniform Imperfections

Wolf's "signature" blue porcelain oven cavities craze or crack through regular and ordinary use. These imperfections, according to Wolf, may appear sooner or be exacerbated through normal and instructed use at high temperatures; *e.g.*, by utilizing the self-clean function.[14] The crux of Plaintiffs' claims relates to crazing that occurs at the front corners of the bevel[15] at the bottom of the oven cavities where the dimensions of the sump change.[16] Photographs of the defect exhibit a similar pattern of chipping, cracking and crazing across all Wolf oven models with blue cavities.[17] Significantly, Wolf's senior engineer in charge of porcelain, Randy Rinehart, testified that imperfections appearing at the outer edges of the oven cavity or on the bevel were not consistent with misuse, but, rather, were apt to have been caused by movement of the oven floor.[18] Mr. Rinehart further testified that defects in Wolf's blue oven cavities occur across all Wolf oven models.[19] Other Wolf witnesses asked about the Company's porcelain oven cavities deferred to Mr.

---

[13]   Ex. 9, Dietsch Tr. at 77:21-23; *see also id.* at 95:5-23, 111:20-24.

[14]   *E.g.*, Ex. 4, Rinehart Tr. at 154:4-21; Ex. 10, at WOLF0144929 ("Improvement in pre-heat time and self clean pyrolysis will exasperate [*sic*] oven floor issues such as crazing, cracking, chipping, spalling, thumping, and staining.").

[15]   A "bevel" is a sloping edge from, in this context, a horizontal surface (such as a beveled mirror). A "sump," in this context, is the bottom of the cavity. *See* Ex. 11, Boyum Tr. at 66:5-12. While the imperfections may appear in a variety of forms and breadth, the most consistent location of the manifested imperfections appear at the bevel corners.

[16]   Ex. 12 (collection of photographs, with attorney notations for clarification, of oven cavity chipping, cracking, crazing and/or flaking).

[17]   *Id.*; *see also* ECF No. 39, Complaint filed by Barry Garfinkle ("Garfinkle Cpt.") at ¶¶47, 48, 50, 61; Sharp Cpt. at ¶¶4, 47,48, 50, 62, 63.

[18]   Ex. 4, Rinehart Tr. at 110:6-19. At least two other Wolf witnesses agreed with this assessment. *See* Ex. 9, Dietsch Tr. at 83:2-16, 84:4-16; Ex. 13, Posorske Tr. at 15:21-16:25, 69:19-20.

[19]   Ex. 4, Rinehart Tr. at 164:5-11.

Rinehart as Wolf's resident porcelain expert and would not dispute his opinions as to the inevitable crazing of Wolf's oven cavities.[20]

Predictably, Plaintiffs' ovens manifested imperfections in the same location that Mr. Rinehart testified would be caused by movement of the oven floor and not misuse.[21] Plaintiffs reported their experiences to Wolf,[22] and have all described the imperfections in a strikingly similar fashion – as chipping, cracking, crazing, flaking or spidering of the porcelain interiors of their Wolf Ovens.[23] The unusually similar nature, appearance and location of the imperfections in Plaintiffs' ovens coincide with Wolf's own witnesses' testimony as the most common and prevalent location of the imperfections.[24]

---

[20]  Ex. 13, Posorske Tr. at 53:8-10; 16:23-25, 69:19-20; Ex. 9, Dietsch Tr. at 64:11-21; Ex. 14, Hoffman Tr. at 102:1-14; Ex.11, Boyum Tr. at 92:6-21 (explaining that Mr. Rinehart knows more about porcelain, based on his experience and background, than anyone at Wolf), 93:5-6 (explaining that Mr. Rinehart is "the most knowledgeable person on porcelain in the organization.").

[21]  *E.g.*, Kail Cpt. at ¶¶45-54; Ex. 15, I. Kail Tr. at 136:15-138:19; Ex. 16, Garfinkle Tr. at 106:4-107:8 (explaining that the imperfections are "focused or concentrated in those, what I describe as small indentations on the bottom" and "95 percent of what I've observed have been associated with the bottom of the oven"), 149:15-150:11; Ex. 17, F. Sharp Tr. at 132:4-25 (describing "shards of [] porcelain on either side of the bottom part of the oven).

[22]  *E.g.*, Ex. 15, I. Kail Tr. at 115:7-15, 117:7-16 (discussing extensive dialogue with Wolf wherein Ivan or Melanie "described what was going on" with their Wolf ovens); Ex. 16, B. Garfinkle Tr. at 19:15-20:4 (discussion with Wolf representative about porcelain damage), 39:21-22, 97:8-98:2, 153:10-154:21; Ex. 17, F. Sharp Tr. at 30:2-17, 91:12-25, 92:1-20 (explaining that he reported porcelain damage to a Wolf authorized dealer, which served as a conduit of information between Mr. Sharp and Wolf).

[23]  Ex. 18, M. Kail Tr. at 72:22-73:17; Ex. 16, B. Garfinkle Tr. at 104:21-105:22 (describing "blue, what looks like splinters of the enamel all over the cloth"), 106:4-13, 106:22-24, 107:20-108:3, 149:15-150:11, 172:21-172:25 (discussing blue particles coming off after being blown around; the "concentration of them is highest in the two depressions and the front"); Ex. 17, F. Sharp Tr. at 26:3-6 ("The lining of the oven cracks and crazes and has fissures and sheds shards of glass and porcelain).

[24]  Ex. 4, Rinehart Tr. at 110:6-25; Ex. 19, Sheldon Tr. at 219:9-24; Ex. 20, June 22, 2017 Report of Wolf's expert R. Lee Robinette of Collateral Evaluation Associates, Inc. ("CEA Report") at p. 12 (explaining that "[t]he primary type of porcelain issue that I saw in the ovens at the Jacksonville distribution center was crazing.  There were small scratches in the porcelain in the corners of the bottom or floor of the oven cavity."); Ex. 9, Dietsch Tr. at 83:2-16, 84:4-16.  Plaintiffs, in fact, confirmed that the imperfections in each of their ovens were *not* the result of misuse or other intervening factors. Ex. 18, M. Kail Tr. at 69:16-21 (did not put foil pans on oven floor); 70:9-14 (did not use commercial cleaners, abrasives, caustic cleaners or detergents in oven); Ex. 16, B. Garfinkle Tr. at 138:3-140:4, 171:9-172:7; Ex. 17, F. Sharp Tr. at 57:3-21 (testifying that he never put anything on the floor of the oven or used any utensils in the oven).

- 5 -

Through discovery, Plaintiffs have learned that Wolf was aware of the manifestation of the imperfections;[25] that the imperfections would predictably and unavoidably occur;[26] that Wolf had internal discussions about addressing the pervasiveness of the occurrence;[27] that Wolf and its authorized service representatives were called to respond to recurring complaints from customers about the imperfections;[28] that, in certain circumstances, Wolf replaced the damaged Blue Cavities or the Blue Ovens entirely;[29] **but,** that Wolf decidedly concluded not to determine what aspect of its processes (*e.g.*, design, manufacturing, shipping) was the root cause leading to the manifestation of the imperfections.[30]

Wolf retained two purported experts[31] in connection with this litigation and its defenses, both of whom testified that they viewed or inspected several Blue Ovens with porcelain damage.  Both observed damage at the corner of the bevels of the bottom oven cavity, with one (R. Lee Robinette) describing the blemish as what appeared to "like a rodent or small animal had scratched the porcelain" in the very same location where Plaintiffs' porcelain damage manifested – at "the corners of the bottom or floor of the oven cavity."[32]  Neither Defendant nor either of its experts could

---

[25]   Ex. 21, Excerpts from Customer Service Database ("CS Excerpts"); Ex 22, Rinehart Ex. 54 at WOLF 0115092 ("There is a customer who is on her 4th oven."); *see also* Ex. 23, WOLF 1353924 ("Porcelain damage in upper oven. Upper cavity already replaced once.").

[26]   Ex. 4, Rinehart Tr. at 73:7-16; Ex. 9, Dietsch Tr. at 110-111; Ex. 19, Sheldon Tr. at 166:20-169:4.

[27]   *E.g.*, Ex. 24, Hammond Ex. 66 at WOLF 0105386-87; Ex. 25, Posorske Ex. 2 at WOLF 0137825; Ex. 26, Posorske Ex. 4 at WOLF 0123748.

[28]   Ex. 21, CS Excerpts; Ex 23 WOLF 1353924 ("Porcelain damage in upper oven. Upper cavity already replaced once."); *see also* Ex. 27, WOLF 1353948; Ex. 28, WOLF0029737-42; Ex. 29, WOLF 1354055-57; Ex. 30, WOLF0105954-70.

[29]   *E.g.*, Kail Cpt. at ¶¶47, 49-52; Garfinkle Cpt. at ¶¶60-63; Ex 31, WOLF 1353887.

[30]   *See infra,* n. 50.  At the outset of this litigation, Plaintiffs could not pinpoint which phase of Wolf's design or manufacturing processes led to, or caused, the imperfections.  Nor, for the purposes of this case, did they need to.

[31]   Plaintiffs reserve the right to challenge the admissibility of the testimony set forth by both of Wolf's experts.

[32]   Ex. 20, CEA Report at 12; Ex. 32, Robinette Tr. at 31:4-20.  These would qualify, under Wolf's internal quality aesthetic standards document – used to "define minimum acceptable aesthetic and cosmetic standards" with a dedicated section entitled, "Porcelain Defect Matrix" that deems "chip[s]" and "crack[s]" as "Not Allowed" – as a "defect" by

pinpoint precisely what caused (or causes) this precise, yet repeated, form of manifested imperfections.[33]   They also could not say how the form and location of the corner bevel imperfections could have been the cause of user error or misuse.[34]

Faced with, and aware of, the reality that Wolf itself is the source of the imperfections that have and will occur in the Blue Ovens, Wolf probed Plaintiffs for rationales it could theoretically use to shift the blame to Plaintiffs by probing inconceivable causes of the crazing – ranging from settling house foundation to dropped utensils to lightning strikes.[35]   The fact witnesses deposed by Wolf's counsel, including Plaintiffs, testified to proper and basic use of the Wolf Ovens and did not identify a single basis for the crazing that manifested from misuse.[36]   Indeed, one of Wolf's manufacturing engineers testified that any incidents of customers causing damage to porcelain cavities would be reflected in the notes maintained in Wolf's customer service records.[37]   But no such notes exist for Plaintiffs or the vast majority of the thousands of customers who have reported porcelain damage to Wolf.[38]

### D.     The Imperfections Have Ancillary and Negative Effects on Consumers' Use of Wolf Ovens

The imperfections are accompanied by loose flakes of porcelain – pieces derived from the cracking or crazing – of the Blue Cavities.  Oven users are, therefore, at risk of having flakes blow

---

Wolf's own technical standards. Ex. 33, Pltfs' Ex. 16, at WOLF 0017708.  Mr. Rinehart testified that "[i]f you can actually catch your finger on a scratch, it is considered a crack . . . [a]nd it's considered a defect." Ex. 4, Rinehart Tr. at 72:9-15.

[33]   Ex. 20, Sheldon Tr. at 133:6-24; Ex. 32, Robinette Tr. at 29:4-34:21.

[34]   Ex. 20, Sheldon Tr. at 231:18-25.

[35]   *E.g.*, Ex. 15, I. Kail Tr. at 97:13-14 (commercial cleaners or scrubbers); Ex. 16, B. Garfinkle Tr. at (110:15-18 (electrical issues, surges or lightning strikes), 101:25-102:12 (frequency of running the self-clean function); F. Sharp Tr. at 36:25-37:2-9 (settling in the home, cracks in the wall, ceilings or floors), 57:3-8 (tin foil/items on the oven floor).

[36]   *Supra* n. 35; Ex. 16, B. Garfinkle Tr. at 88:25-90:25 (testifying to reading use & care manual); Ex. 17, F. Sharp Tr. at 54:24-55:3; 82:6-17, 99:18-25, 100:2-103:25 (testifying to reading and following instructions in user manual).

[37]   Ex. 13, Posorske Tr. at 58:10-59:1.

[38]   *See*, *e.g.*, ECF No. 24-13, Stetson Decl. at Ex. A; Ex. 21, CS Excerpts.

onto and potentially contaminating food.[39]  Indeed, Wolf is on notice of its customers experiencing porcelain pieces on food after cooking in their Wolf Ovens.[40]  Because of this risk, and the potential for worsening the imperfections, Plaintiffs and the consumers they seek to represent are faced with the dilemma as to whether to run the Wolf Ovens' self-clean function (and risk additional damage) or stop using the function (and lose the benefit of the self-cleaning attribute entirely).[41]  Wolf has maintained that imperfections, while aesthetically displeasing, do not render the Wolf Ovens unsafe to use.[42]  But testimony confirms that Wolf's customers are not convinced that the shards exhibited from the imperfections are safe and, instead, stated a preference or need to cover all food cooked in the Wolf Ovens to ensure it is not contaminated.[43]

### E.   Discovery Demonstrates that Wolf Has Been Aware that the Porcelain Interior of the Wolf Oven Cavities Will Craze and Form Imperfections

Wolf knows that regular use of its ovens will lead to crazing or cracking of the oven cavities, and that it would be most perceptible on its Blue Cavities.  Customer complaints about this issue were escalated to senior Wolf executives, including the chief manufacturing engineer in charge of

---

[39]   *See, e.g.*, ECF No. 35, Memorandum and Order at 18 ("it is unclear whether chipped porcelain contaminates food cooked in the oven," therefore "[t]he durability of the porcelain may affect the functionality of the oven" because porcelain pieces may fly onto the food . . . [such that] the range may be incapable of being cleaned, thus preventing the Kails from using it."); *see also* Ex. 34 at WOLF 1353401 ("I don't believe glass shards and particles that can become airborne due to the convection fans that are continuously operating inside the oven make this a problem that is only cosmetic); Ex. 16, B. Garfinkle Tr. at 139:17-19 ("And my assumption was it was because they were blown around by the fans that run for the self-cleaning part."); Ex. 35 at WOLF 0129677-78 (noting health concerns due to chipping of blue porcelain interior).

[40]   Ex. 34 at WOLF 1353401; Ex. 24, Hammond Ex. 66 at WOLF 0105386 ("Many Customers complaining about this being unacceptable.  Many state that glass like shards end up in the food."); Ex. 30 at WOLF 0105970 ("the place where the porcelain is coming off in shards bothers me.  There was a blue piece of it on top of a loaf of bread I took out of the oven this week, which seems to indicate the fans are blowing it around.  That's easy to see on a loaf of bread, but may be missed in a casserole or in a batch of chicken pieces.  The way it felt in my finger it's not something I want to imagine in someone's mouth or throat).

[41]   Ex. 17, F. Sharp Tr. at 22:25-23:2-19, 77:24-78:2, 141:16-22; Ex. 15, I. Kail Tr. at 97:4-99:24.

[42]   Ex. 36, Posorske Ex. 1 at WOLF 0002249 (referring to porcelain crazing as "harmless").

[43]   Ex. 34 at WOLF 1353401 ("It's a very egregious defect and now we are going to half [sic] to cook ***everything*** inside the oven with a cover on it for the rest of its lifespan.") (emphasis in original); *see also* Ex. 17, F. Sharp Tr. at 22:25-23:2-19, 77:24-78:2, 141:16-22.

porcelain finishing, Mr. Rinehart, the head of Design Engineering, Terry Hoffmann,  as well as directly to Wolf's President and Chief Executive Officer ("CEO"), James Bakke.[44]  Internal documents obtained through discovery show that "porcelain damage" was a significant basis for customer complaints (*e.g.*, at times, the number one return reason code tracked by Wolf's customer service team).[45]  Discovery obtained in this case reveals ***several thousand*** ticket entries from Wolf's customer service database relating to the imperfections, along with emails, photographs, etc., from complaining customers that further support the widespread nature of the defective Wolf oven cavities.[46]  Discovery further confirmed that Wolf representatives knew the crazing would take place or was inevitable to occur.[47]  In addition to its awareness of the prevalence of the imperfections, Wolf understood that, from an aesthetics perspective, the crazing was (and would be) more visible in Wolf's Blue Oven cavities due to the color and (unflecked) pristineness of the hallmark blue.[48]

---

[44]  *E.g.*, Ex. 24, Hammond Ex. 66 at WOLF 0105386 (Wolf's Director of Reliability Engineering acknowledging that "[t]he Enamel cracking and peeling is a ***massive issue***" in Wolf's dual fuel and wall ovens and noting that "***Many Customers*** [were] complaining about this being unacceptable."); Ex. 37, Dietsch Ex. 4 at WOLF 0114498 (Senior Project Engineer stating that "[t]his type of porcelain damage can be cause [sic] by ***normal use***."; Wolf's chief porcelain expert exclaiming that "this is ***not abnormal porcelain damage*** to the oven floor."); Ex. 38, Rinehart Ex. 50 at WOLF 0105408 (Wolf's Senior Manufacturing Engineer in Charge of Finishing stating that "[t]his kind of damage is ***all too common*** . . ."); Ex. 39, WOLF 0109458-61 (dubbed, "Presidential Letters" by Wolf representatives).

[45]  *See* Ex. 40, Pltfs' Ex. 35, WOLF 0105059 (showing "porcelain damage" as significant percentage of RMT – *i.e.*, product replacement – "tickets" in Wolf's customer service database, and in one instance, over 26% of the total tickets).

[46]  *E.g.*, Ex. 21, CS Excerpts; Ex. 41, Stetson Tr. at 110:16-111:10; Ex. 42, and Sub Exhibit Tabs 01-34 (compilation of, and summary chart describing, dozens of customer complaints regarding Wolf Ovens manifesting imperfections) ("Customer Complaints Compilation"); Ex. 43, WOLF 1353369 ("I am horrified to have found damage to the interior."); Ex. 34 at WOLF 1353401 (describing "very egregious defect" and referencing photograph of "several pieces of that glass porcelain" that are "sizeable"); Ex. 44, WOLF 1353394 (photograph of blue glass shards resulting from porcelain chipping). Plaintiffs are aware of at least one putative class member who communicated with Wolf about the porcelain imperfections at issues in this litigation and after a discussion about the pending litigation, was provided with a full refund of the purchase price of her Wolf oven.  *See* ECF No. 45-1; Ex. 21, CS Excerpts at 9 and 13 (entries for serial number 18062220).

[47]  Ex. 4, Rinehart Tr. at 73:7-16, 133:13-15; 139:12-14; 139:18-19; Ex. 13, Posorske Tr. at 62:2-63:7; Ex. 19, Sheldon Tr. at 44:3-46:23; Ex. 10 at WOLF0144929 (referring to "***inherent porcelain performance issues*** with the oven floor"); Ex. 45 at WOLF 0158629 (noting that Wolf obtained software that allows it to "[p]redict porcelain damage of new cavity due to heat").

[48]  Ex. 4, Rinehart Tr. at 198:17-24.

Notwithstanding the overall awareness within Wolf, coupled with requests by Mr. Rinehart to improve efforts to identify the cause and execute remedial measures to eliminate the incidence of the blemishes,[49] Wolf did not undertake an investigation or conduct a study to determine the causes of the porcelain defect or remedy the issue.[50]  In fact, Wolf's own expert, Brian Sheldon, testified that, based on his work and assessment associated with this case, including personal visits to Wolf's production and assembly lines and discussions with Wolf employees, Wolf did not have an explanation for why the Blue Cavities are prone to crazing or cracking, and did not perform a root cause analysis to gain an explanation.[51]

### F.    Purchasers of Wolf Ovens with Blue Porcelain Interiors Were Uniformly Damaged

Plaintiffs were harmed immediately upon their purchases of Wolf Ovens, because each oven – range or wall oven, double or single oven, etc. – was advertised, promoted and sold as containing Wolf's "signature aesthetics" and durability, including its fleckless blue porcelain oven cavity, which Wolf promoted, and continues to highlight, as a key product feature.[52]  Each Wolf Oven was designed with a blue porcelain oven cavity and sold to consumers without disclosing that those oven cavities will crack or craze with normal use (*e.g.*, through the regular operation of the self-clean function).

---

[49]   *See* Ex. 46, Rinehart Ex. 53 at WOLF 0143201-02.

[50]   *See*, *e.g*., Ex. 47, Pltfs' Ex. 32A, WOLF 0127924-26 (refusing to investigate severe porcelain damage); Ex. 46, Rinehart Ex. 53, WOLF 0143201-04 (demonstrating an inability to categorize porcelain damage to influence design changes); Ex. 4, Rinehart Tr. at 90:16-8 (having protocol for photographing defects "would help clarify and streamline the process of determining what actually happened to a customer's oven"), 94:9-95:23 (detailing Mr. Rinehart's inability to get ovens brought back for inspection despite requests or to get useful knowledge or information from customer service representatives about customer use regarding cracked oven cavities); Ex. 41, Stetson Tr. at 83:6-11 (failing to identify any instance where a field service manager inspected an oven due to porcelain damage); Ex. 11, Boyum Tr. at 55:23-25 (Wolf quality manager failing to recall even a single instance in which Wolf tried to assess what caused the imperfections), 96:3-11 (failing to recall an instance in which a Wolf oven cavity was analyzed or tested to determine what caused an imperfection).

[51]   Ex. 19, Sheldon Tr. at 275:3-6; 161:22-162:23; *see also* Ex. 11, Boyum Tr. at 61:2-9.

[52]   Ex. 7, Def's Ex. 10 at KAIL0000389; Ex. 48, Def's Ex. 11 at KAIL0000500; *see also* Ex. 49, Def's Ex. 13 at KAIL0000574.

Wolf has sold tens of thousands of Wolf Ovens with Blue Cavities to consumers during the Class Period.[53] The harm to each purchaser of a Wolf Oven is the same. Plaintiffs were harmed in that they would not have purchased their Wolf Ovens had they known the oven cavities' propensity to crack or craze through normal use, or they would have paid less had they known the truth. Plaintiffs and class members were damaged in the form of: (1) the purchase price of their Wolf Oven or (*e.g.*, a full refund); (2) the premium price charged for Wolf's defective blue porcelain oven cavities; and/or (3) the costs associated with repairing or replacing the defective oven cavities.[54]

Plaintiffs testified about the consistent nature of the damage to their Wolf Ovens. Plaintiffs experienced the same cracking or crazing at the front corner of their ovens' bevels.[55] Testimony and record evidence strengthens the notion that class members cannot operate their ovens as intended given their ovens' propensity to chip, crack and/or craze.[56] Moreover, Plaintiffs testified that they would not have purchased their oven or ovens had they known that Wolf Ovens crack or craze with regular use.[57]

### G.  Damages Can Be Measured on a Classwide Basis

Plaintiffs retained economist Stefan Boedeker who will demonstrate through a choice-based conjoint analysis that class members were uniformly injured at the time they purchased their Wolf Ovens by paying a price premium for ovens that did not live up to Wolf's warranties and advertising. Mr. Boedeker's proposed damages calculation is capable of reliably isolating the pertinent price

---

[53]  Based on nationwide sales from 2006 through November 2017. *See* Ex. 50, WOLF 0259626.

[54]  Plaintiffs also seek damages under New York GBL §349 (Mr. Sharp) and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Dr. Garfinkle).

[55]  Ex. 15, I. Kail Tr. at 162:5-163:23; Ex. 18, M. Kail Tr. at 184:11-24; Ex. 16, B. Garfinkle Tr. at 106:4-24; Ex. 17, F. Sharp Tr. at 69:2-70:7.

[56]  *See supra*, §II.D., p. 7-8; *see also* Ex. 51, WOLF1353390-92; Ex. 23 at WOLF 1353924; Ex. 30 at WOLF0105954-70; Ex. 52 at WOLF0109450.

[57]  Ex. 15, I. Kail Tr. at 173:6-174:20; Ex. 18, M. Kail Tr. at 160:7-163:12; Ex. 16, B. Garfinkle Tr. at 81:22-82:3; Ex. 17, F. Sharp Tr. at 112:3-115:24.

premium and establishing the full extent of damages on a class-wide basis,[58] and his conjoint damages models have been found by courts to satisfy the demands of *Comcast*.  *See infra* §V.A.2.b., p. 24-25.

## III.   LEGAL STANDARD FOR CLASS CERTIFICATION

A class action is the primary tool available to consumers to adjudicate a case concerning small claims that are not economically practicable to pursue on an individual basis.  The Supreme Court has recognized that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981).  In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). As Judge Posner noted in affirming class certification in *Butler v. Sears, Roebuck & Co.*:

> A class action is the more efficient procedure for determining liability and damages in a case such as this involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. . . .  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

702 F.3d 359, 362 (7th Cir. 2012).

To certify a class, Plaintiffs must demonstrate that the putative class action satisfies each of the four requirements of Rule 23(a), as well as at least one of the categories provided in Rule 23(b).  *See In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 132-33 (2d Cir. 2001).  "The Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction.'"  *Gortat v. Capala Bros., Inc*., 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting *Marisol*

---

[58]    *See* Declaration of Stefan Boedeker, attached as Ex. 53 to the Serra Decl.

*A.by Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)); *see also Caballero by Tong v. Senior Health Partners, Inc.,* No. 16 CV 0326 (CLP), 2018 WL 4210136, at *13 (E.D.N.Y. Sept. 4, 2018). In fact, "it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Gortat*, 257 F.R.D. at 361-62 (quoting *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

## IV.   THE REQUIREMENTS OF RULE 23(a) ARE READILY MET

Rule 23(a) sets forth four threshold requirements for certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  Fed. R. Civ. P. 23(a).

### A.   The Classes Satisfy the Numerosity Requirement

Generally, a presumption of numerosity attaches to classes of more than 40 in the Second Circuit.  *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 400 (S.D.N.Y. 2016).  This case satisfies the numerosity requirement.  *Morales v. Rochdale Vill., Inc.*, No. 15-CV-502-RJD-SJB, 2018 U.S. Dist. LEXIS 131019, at *28 (E.D.N.Y. Aug. 1, 2018) ("[n]umerosity is presumed for a class of forty or more").  For example, Wolf sold 107,490 ovens with blue porcelain cavities nationwide between 2015 – the year the original complaint at issue in this litigation was filed – and November 2017 alone.[59]

### B.   Commonality Is Satisfied

Did Defendant fail to warn consumers of the imperfections that would manifest in the Wolf Ovens?  Did Defendant promote or market the Wolf Ovens in a false or misleading manner?  Are Plaintiffs' Wolf Ovens fit for their ordinary purpose?  Do imperfections manifest in the porcelain of Wolf Ovens – or, more perceptibly, in the Blue Cavities?  Have Plaintiffs and the putative class they seek to represent been injured as a result of Wolf's advertising practices or failure to warn?  Are

---

[59]   Ex.50 at WOLF 0259626.

Plaintiffs and the class entitled to damages?  Each one of these questions represent common questions of fact or law that, individually or collectively, satisfy the commonality element of class certification.[60]

Commonality is met when "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality does not mandate that all class members make identical claims and arguments." *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996).  An issue that is common to the class is one that is susceptible to generalized, class wide proof.  *U.S. v. City of New York*, 276 F.R.D. 22, 28 (E.D.N.Y. 2011).  The commonality requirement may be met where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system." *Marisol*, 126 F.3d at 377.  In fact, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2562 (2011); *see also Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614 (LGS), 2018 WL 3869896, at *3 (S.D.N.Y. Aug. 15, 2018) (commonality can be satisfied "'where a single issue of law or fact is common to the class'"); *Mayhew v. KAS Direct, LLC,* No. 16 CV 6981 (VB), 2018 WL 3122059, at *5 (S.D.N.Y. June 26, 2018) ("A single question of law suffices to satisfy the commonality requirement.").  Moreover, the "commonality standard does not mandate that the claims of the lead plaintiff be identical to those of all other plaintiffs." *Blagman v. Apple, Inc*., No. 12 Civ. 5453(ALC), 2014 WL 2106489, at *7 (S.D.N.Y. May 19, 2014).

Here, Plaintiffs have alleged common questions, as detailed above, which generate common answers, by which members of the class suffered the same injury.  *See, supra* n. 60 (referencing Ex. 1 (list of common factual and legal questions)); *see also Kurtz v. Kimberly-Clark Corp*., 321 F.R.D. 482, 531-32 (E.D.N.Y. 2017) (finding commonality satisfied where answers to common

---

[60]    A more exhaustive list of common factual and legal questions is attached as Ex. 1 to the Serra Decl.

questions – *e.g.*, what "flushable" representation means to a reasonable consumer and whether class members paid an unsupported premium as a result of the representations – can be proven through common evidence); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) ("*Scotts*") (finding questions that are common to all class members – *e.g.*, the answer as to whether representations or labeling claims that Scotts Turf Builder EZ Seed is "50% thicker With Half the Water" – and were "apt to drive the resolution" of the litigation); *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (commonality found where "the injuries being litigated all derive from the alleged misrepresentation of what is pomace as 100% Pure Olive Oil"); *see also In re Arris Cable Modem Consumer Litig.*, No. 17-CV-01834-LHK, 2018 WL 3820619, at *13 (N.D. Cal. Aug. 10, 2018) ("whether the Modems contain any latency defects is a common issue of fact" and does not defeat the lement of commonality); *In re Whirlpool Corp. Front-Loading Waser Prods. Liab. Litig.*, 678 F.3d 409, 419 (6th Cir. 2012) ("Because the plaintiffs have produced evidence of alleged common design flaws" commonality is satisfied); *Morales*, 2018 U.S. Dist. LEXIS 131019, at *35 (noting that the commonality requirement is satisfied even when nuanced or individual experiences of class members exist, as long as their injuries derive from the same sourced breach or course of conduct).  Indeed, based on ***any*** of these questions, standing alone, the commonality requirement has been satisfied.

### C.   Plaintiffs' Claims Are Typical

Plaintiffs' claims, as well those of the class members, arise from a singular marketing strategy.  Defendant promotes its Wolf Ovens as high-end and durable.  It markets the Blue Cavities and overall oven aesthetics as "hallmark."  None of Wolf's advertising or product materials, however, warn consumers of the likelihood – if not inevitable – crazing that will occur.

"The typicality requirement [under Fed. R. Civ. P. 23(a)(3)] is not demanding." *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (internal quotations omitted); *see also*

*Zhang v. Wen Mei, Inc*., No. 14-CV-1647 (JS)(SIL), 2017 WL 8813132, at *16 (E.D.N.Y. Dec. 28, 2017) ("Typicality is 'not highly demanding.'").   The threshold for meeting the typicality requirement is low, as the requirement is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Price*, 2018 WL 3869869, at *3 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 574 F.3d 29, 35 (2d Cir. 2009)).

When "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability" then typicality is satisfied. *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *see also Scotts*, 304 F.R.D. at 406 (plaintiffs need only show "that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.").  Minor discrepancies in the facts or circumstances that triggered the individual claims do not negatively impact a typicality argument.  *Robidoux*, 987 F.2d at 936-37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *see also Balderramo v. Go N.Y. Tours, Inc*., No. 15 Civ. 2326 (ER), 2017 WL 2819863, at *3 (S.D.N.Y. June 28, 2017) (quoting same); *Ebin*, 297 F.R.D. at 566-67 (purchasers of olive oil were typical of other class members despite differences pertaining to their individual purchasing decisions).

Here, Plaintiffs and other class members' claims arise out of the same course of conduct by Defendant and Plaintiffs were exposed to the same marketing as putative class members. *See Price*, 2018 WL 3869896, at *4 ("Because Plaintiffs were exposed to the same marketing and packaging as every other consumer who purchased the Products, Plaintiffs are typical of the classes they seek to

represent."). They are further based on identical legal theories. Every Wolf Oven with the "signature" blue porcelain interior contained the imperfections. Wolf was, and is, well-aware of the imperfections, *e.g.*, the fact that regular use of its ovens will cause cracking or crazing in its "signature" blue porcelain cavity.[61] In fact, discovery has shown that Wolf received several thousand ticket entries from its customer service database relating to the imperfections.[62] What is more, internal documents show that the imperfections, *e.g.* "porcelain damage," was the number one return reason code tracked by customer service, representing almost 30% of all tickets tracked in the customer service database for certain years.[63] Plaintiffs have, therefore, been injured in the same manner as other class members; meaning, through the purchase of the Wolf Ovens that contained the imperfections.[64]

Plaintiffs and class members seek redress through common legal claims that show the damages they have suffered because they paid more for the Wolf Ovens than they would have, absent Wolf's deceptive marketing.

### D. Plaintiffs Will Adequately Represent the Classes

Adequacy calls for a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the

---

[61]   *See* Ex. 42 and Sub Exhibit Tabs 01-34, Customer Complaints Compilation; *see also* Ex. 24 at WOLF 0105386; Ex. 21, CS Excerpts; Ex. 37, Dietsch Ex. 4 at WOLF 0114498; Ex. 38, Rinehart Ex. 50 at WOLF 0105408.

[62]   Ex. 21, CS Excerpts.

[63]   Ex. 40, Pltfs' Ex. 35, WOLF 0105059.

[64]   "It is not required that the underlying facts be identical for all class members. Instead, the typicality requirement 'requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" *Mayhew*, 2018 WL 3122059, at *5 (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999).

litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  The factors are satisfied here.

Plaintiffs have interests that are aligned with absent class members; not antagonistic.  That is, Plaintiffs have no conflicts with any class members.  Plaintiffs, like each absent class member they seek to represent, have an interest in establishing and proving Defendant's common course of conduct, confirming its unlawfulness, identifying and demonstrating the impact of the unlawful conduct and, finally, obtaining redress.

Plaintiffs have also demonstrated their commitment to pursue these claims on behalf of absent class members.  They responded to extensive written discovery requests and each sat for several hours of deposition questioning.  Plaintiffs testified they have knowledge of the factual allegations and other issued raised in the lawsuit and researched whether other consumers shared their same experience with the Defect.[65]  Plaintiffs have conducted diligent searches for materials responsive to Defendant's discovery requests.[66]

These are the basic premises for demonstrating adequacy and, as such, Rule 23(a)(4) has been met.  *See Scotts*, 304 F.R.D. at 406-07 (recognizing that plaintiffs demonstrated a commitment to pursuing the claims on behalf of the class by sitting for depositions and demonstrating an understanding their representative role); *see also Kurtz*, 321 F.R.D. at 538; *Elkind v. Revlon Consumer Prods. Corp.*, No. CV 14-2484 (JS) (AKT), 2017 U.S. Dist. LEXIS 24512, at *27 (E.D.N.Y. Feb. 17, 2017).[67]

---

[65]    Ex. 18, M. Kail Tr. 174:2-12 It's 184:11-185:6; Ex. 15, I. Kali Tr. 36:6-18, 71:1-20; 72:6-24, 174:2-12 ("the fact that we have done this research and see that there are other people, it's no longer about my wife and myself.  ***It's now trying to figure out how to help other people from falling into the same predicament that we're in"***).

[66]    *E.g.*, Ex. 15, I. Kail Tr. at 67:13-25; Ex. 18, M. Kali Tr. at 16:22-17:1; Ex. 17, F. Sharp Tr. at 34:6-20.

[67]    Mr. Sharp's wife, Linda Sharp, though not a named plaintiff in this action, testified that she would be interested in serving as a class representative should the appropriate circumstances arise.  Ex. 54, L. Sharp Tr. at 21:15-23.

Robbins Geller Rudman & Dowd LLP ("Robbins Geller") is one of the largest and most successful plaintiffs' class action firms in the country with 200 lawyers, 10 offices throughout the nation, and the resources and willingness to litigate this case through trial and appeal if necessary. *See* Robbins Geller Firm Resume, Ex. 55.  Robbins Geller has recovered tens of billions of dollars for class members in large, complex consumer class actions and has been appointed class counsel in some of the largest and most complex consumer fraud cases in history.[68]

## V.      REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(b) ARE SATISFIED

A plaintiff seeking monetary relief can satisfy the prerequisites of Rule 23(b)(3) by demonstrating that questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members," and that a class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods*, 521 U.S. at 615; *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010); *In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006).  A plaintiff seeking certification of claims for injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) can also demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Whether seeking certification under Rule 23(b)(2) or 23(b)(3), a plaintiff might bear the initial burden of advancing reasons why a putative class action meets Rule 23 requirements.  Once a plaintiff has made a preliminary legal showing that the requirements of Rule 23 have been met,

---

[68]     *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 16-cv-00296, MDL No. 2672 (N.D. Cal. Jan. 21, 2016), ECF No. 20; *In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804, MDL No. 2804 (N.D. Ohio Jan. 4, 2018), ECF No. 37; *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785, MDL No. 2785 (D. Kan. Sept. 12, 2017), ECF No. 40; *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752 (N.D. Cal. Feb. 9, 2017), ECF No. 13.

however, the burden of proof is shifted to defendants to demonstrate otherwise.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citing *Amchem Prods.*, 521 U.S. at 614); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202-03 (2d Cir. 2008).

### A.  Common Questions of Law or Fact Predominate

Rule 23(b)(3)'s predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" (*City of New York*, 276 F.R.D. at 30), and "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Fed. R. Civ. P. 23(b)(3).  In determining whether the class is a "sufficiently cohesive" unit, all factual or legal issues that are common to the class inform the court's analysis.  *Amchem Prods., Inc.*, 521 U.S. at 621.  Predominance need only be satisfied for one of plaintiffs' claims to support certification.[69]  *See Elkind*, 2017 U.S. Dist. LEXIS 24512, at *43-*44.

### 1.  Plaintiffs' Claims Are Subject to Classwide Evidence

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  The court must only find that the issues subject to generalized proof outweigh those issues that are subject to individualized proof.  *See In re Nassau Cty. Strip Search Cases*, 461 F.3d at 227-28.  Further, predominance under Rule 23(b)(3) requires only "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Connecticut*

---

[69]  A chart of the active causes of action for each plaintiff is attached for the Court's convenience as Ex. 56 to the Serra Decl.

*Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).  The test for predominance "has been held to be 'readily met' in cases involving alleged consumer fraud."  *Elkind*, 2017 U.S. Dist. LEXIS 24512, at *40.

Here, central liability issues include whether: (1) Wolf falsely advertised and/or deceptively marketed and sold Wolf Ovens containing the Defect; (2) Wolf's statements and omissions were likely to deceive or mislead class members; (3) the sale of Wolf Ovens to class members with the Defect breached an express or implied warranty; and (4) class members were injured by paying more for their Wolf ovens than they would have absent Wolf's false and misleading advertising.  These questions go to the heart of the litigation, are common to all class members, and can be established through generalized and common evidence such as Wolf's internal e-mails, marketing materials, website, customer service records, internal company document, customer complaints and deposition testimony from its employees and witnesses.

Further, given the uniformity of Wolf's advertising, these are precisely the types of issues and claims that courts routinely certify as similar consumer class actions.  *See Scotts*, 304 F.R.D. at 409 (finding predominance satisfied and certifying class based on §349 claims because they "depend on generalized evidence," and "[c]lasswide evidence will be used to establish whether Scotts's labeling of EZ Seed was false, and if so, whether it was likely to mislead a reasonable consumer acting reasonably under the circumstances"); *Ebin*, 297 F.R.D. at 568-69 (finding predominance satisfied and certifying class based on §349, implied and express warranty, and negligent misrepresentation claims because the same common evidence and classwide proof will be used to prove each); *Moore*, 306 F.3d at 1253; (claims based on "uniform misrepresentations made to all members of the class . . . are appropriate subject[] for class certification because the standardized misrepresentations may be established by generalized proof."); *In re Arris Cable Modem Consumer*

- 21 -

*Litig.*, 327 F.R.D. 334, 361 (N.D. Cal. 2018) (finding plaintiffs met their burden "to establish that the existence of the defects is subject to common proof, and that such common questions predominate over individual questions"); *Price*, 2018 WL 3869896, at *6 (certifying class and finding "[c]lasswide evidence will be used to establish whether Defendants' labeling was deceptive, and if so, whether it was likely to mislead a reasonable consumer acting reasonably under the circumstances.").

### 2. Damages Are Measurable on a Classwide Basis

Under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), a model for determining class wide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (clarifying that the *Comcast* "Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance"); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) ("a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory."). In other words, "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Comcast*, 133 S. Ct. at 1433. But, "[p]laintiffs are not required to set forth their final suggested protocol for how damages should be calculated. Instead, they need only show that the ***methodologies*** that they propose are not so insubstantial as to amount to no method at all." *Leider v. Ralfe*, No. 01 Civ. 3137 (HB)(FM), 2004 WL 1773330, at *13 (S.D.N.Y. July 30, 2004) (internal quotations and citations omitted).[70]

---

[70]   When issues of liability can be determined with common classwide evidence, the predominance standard can be satisfied even if damages are not provable in the aggregate. *See* Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App. at 141 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by the individuals within the class."); Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. §1781, at 235-37; W. Rubenstein, Newberg on Class Actions §4:54 at 205 (5th ed. 2012) ("individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").

The Second Circuit recently affirmed that *Comcast* "left undisturbed" the law of the Circuit "that individuated damages determinations alone cannot preclude certification under Rule 23(b)(3)." *Roach*, 778 F.3d at 409; *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (it is still "clear that individualized monetary claims belong in Rule 23(b)(3).") (citing *Wal-Mart*, 131 S. Ct. at 2558).

Proof of damages for Plaintiffs' claims will be simple and straightforward. Plaintiffs advance several methodologies that can show class members were uniformly damaged in their purchase of their Wolf Ovens containing the Defect.

### a.    Replacement Value of the Wolf Oven Cavities

One form of uniform damages that Plaintiffs and class members suffered is the value associated with the replacement of their oven cavities as determined by Wolf's itself. Wolf's own documents and testimony from its employees have already demonstrated that Wolf associates a $1200 value with cavity replacements (or $1900 for a double oven).[71] This value can then be multiplied by the number of class members for a simple classwide damages calculation. Because this form of damages is tied to Plaintiffs' theory of liability (*i.e.*, that Wolf's oven cavities are defective) and is susceptible to common proof, it satisfies *Comcast* and predominates over any conceivably related individual issues. *See Gold v. Lumber Liquidators*, 323 F.R.D. 280 (N.D. Cal. 2017) (certifying class of flooring consumers on the ground that replacement costs for allegedly defective flooring through "data on the labor hours needed for each task associated with floor replacement, local trade labor rates, material pricing, and appropriate contractor markups").[72]

---

[71]    *E.g.*, Ex. 57, Pltfs' Ex. 9 at WOLF 0010998, 11002; *see also* Ex. 17, F. Sharp Tr. at 116:13-24 (recalling conversation in which he was quoted $1,200 to replace the cavity alone, apart from removal and installation costs).

[72]    *See also Falco v. Nissan N. Am., Inc.*, No. CV-13-00686(DDP), 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) (certifying class of consumers because the cost to repair the timing chain systems in several Nissan vehicles was an adequate measure of class wide damages); *Yamada D.D.S. v. Nobel Biocare Holding AG*, 275 F.R.D. 573 (C.D. Cal. 2011) (certifying class based upon cost to repair defective dental implants).

### b.    Price Premium Damages

Plaintiffs retained economist Stefan Boedeker, Managing Director at Berkeley Research Group with 25 years of experience applying economic, statistical and financial models, to develop an economic loss model to develop a statistical methodology to quantify the damages suffered by class members attributable to the purchase of the Wolf Ovens that do not have certain attributes as advertised and sold.[73] Specifically, Mr. Boedeker proposes to use a conjoint analysis to empirically measure the "difference between the price paid and the price paid if customers had been told at the time and point of purchase about the imperfections" (*i.e.*, the price premium). *See Id.* ¶137.

Conjoint is a widely accepted and reliable analysis to value product attributes and is considered an inherently reliable damages methodology that can be successfully used to calculate classwide damages, or show that classwide damages can be calculated.[74] Conjoint analysis relies on data produced by surveys with hypothetical product-feature and price variations, conducted specifically for the purposes of evaluating a specific product to tease out the value to consumers of a particular product feature." *Price*, 2018 WL 3869896, at *10.  The surveys do not require "extensive data on actual sale prices or competing products in the market to produce valid results."  *Id.*  And, specifically, in similar product defect and false advertising cases, courts have found Mr. Boedeker's proposed and implemented conjoint analyses to be reliable methods of showing classwide damages. *See Broomfield v. Craft Brew Alliance, Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *20 (N.D.

---

[73]    *See* Ex. 53, Boedeker Dec. at ¶15.

[74]    *Price*, 2018 WL 3869896, at *10; *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 335–37 (D.N.H. 2017) ("*Dial*"); *Scotts*, 304 F.R.D. at 413-15; *Dzielak v. Whirlpool Corp.*, No. 12-0089(KM)(JBC), 2017 WL 1034197, at *6 (D.N.J. Mar. 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 657 (9th Cir. 2017); *Khoday v. Symantec Corp.*, C.A. No. 11-180(JRT/TNL), 2014 WL 1281600, at *10 (D. Minn. Mar. 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *Clay v. CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2018 WL 4283032, at *13 (S.D. Cal. Sept. 7, 2018); *In re Lenovo Adware Litig.*, C.A. No. 15-md-02624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, No. 11-01067-CAS, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, No. C-11-03082-LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wa. 2012).

Cal. Sept. 25, 2018) (finding Mr. Boedeker's conjoint analysis could measure the price premium associated with representation Kona Beer is brewed in Hawaii); *Dial*, 320 F.R.D. at 328-332 (Mr. Boedeker's proposed conjoint analysis could isolate and measure value of claim "Kills 99.99% of Germs"); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d. 936, 975-76 (N.D. Cal. 2018) (Mr. Boedeker's conjoint analysis measuring value of MyFord Touch defect satisfied *Comcast*).

Conjoint analyses are utilized to demonstrate consumers' preferences for a particular product as driven by features or descriptions of features embodied in that product. *Id*. at ¶56. A conjoint analysis can measure these preferences through a survey where respondents are shown several product profiles with randomized product attributes (including price) and asked to indicate which profiles they would choose. *Id.* ¶57. After the completion of the survey, the conjoint analysis uses data collected from each respondents' preferences to statistically measure the value of each of the product attributes. This value is called a "part-worth." *Id.* ¶58. The conjoint analysis adds up the part-worths to determine the share of respondents that would have purchased the product in different market scenarios and associated prices. *Id.* Finally, the conjoint analysis utilizes a market simulation to calculate the price reduction needed to compensate for the loss of a feature, or the additional price customers would pay in the marketplace for the inclusion of a feature. *Id.*

Here, Mr. Boedeker proposes using a form of conjoint analysis known as Choice-Based Conjoint Analysis ("CBC"), where study participants are shown sets of product profiles (called "choice sets" or "choice menus"), and are asked to choose the profile that they would prefer to purchase if the choice menu offered would describe the only products that were available. *Id.* at ¶60. CBC will enable Mr. Boedeker to determine the difference in value (measured in dollars) or as a percentage of the purchase price in the Actual World) that customers place on a kitchen oven product without imperfections compared to an otherwise identical oven with imperfections. *Id.*

At the class certification stage, Courts do not require the conjoint analysis to be fully performed and completed; rather, classwide damages at this stage is satisfied by showing that the proposed conjoint methodology can prove common damages based upon plaintiffs' allegations. *See Price*, 2018 WL 3869896, at *11 ("'[N]othing in *Comcast* requires an expert to perform his analyses at the class certification stage.'"); *Scotts*, 304 F.R.D. at 413-14 (at class certification stage, proposed conjoint analysis was sufficient and did not have to be performed to calculate price premium associated with Defendant's advertising of "50% thicker"); *Clay*, 2018 WL 4283032, at *11 (rejecting argument that class certification should be denied unless experts have already calculated damages).[75]

Plaintiffs and their expert Mr. Boedeker, however, did not stop at a mere showing.  In addition to detailing his proposed conjoint methodology, Mr. Boedeker  retained a survey company to run a "pre-test" CBC survey to gain an understanding of how certain oven attributes impact preferences and choice behaviors of consumers and how consumers rank the importance of such attributes.  *Id.* ¶¶101-04 (discussing the make-up of 500 respondents who answered questions designed to elicit their thoughts on kitchen ovens).  This "pre-test" determined statistical values of weighted importance on certain oven attributes that ensure the proposed conjoint analysis will offer choice sets that mirror those consumers encounter in the market.  *Id.* ¶¶114-121.

Mr. Boedeker's conjoint analysis is ideally suited to measure damages for the Class because conjoint "can effectively determine the value customers ascribe to a particular product attribute" such as a pristine blue oven cavity or an oven's self-clean feature.  *Dial*, 320 F.R.D. at 334.  Notably, in similar cases, courts have approved of conjoint analysis as a technique to show common damages

---

[75]    *See also Sanchez-Knutson*, 310 F.R.D. at 538-39 (finding that proposed conjoint methodology sufficient model to show common price premium damages associated with defect in Ford vehicles that allowed exhaust and gas to enter the vehicle during normal use); *Guido*, 2014 WL 6603730, at *5, *10-*14 (proposed conjoint analysis was sufficient to quantify the impact of a flammability label warning on the market price of a product, even though actual analysis was not run).

associated with product defects and/or false advertising.[76]  And, as noted above, Mr. Boedeker's

conjoint analyses have themselves been found to satisfy *Comcast*.  *See*, *supra*, §V.A.2.b., p. 24-25.

For example, in *Dial*, Mr. Boedeker recently utilized a conjoint analysis to "'determine whether

Plaintiffs and the other class Members had been deprived of a measurable monetary portion of the

benefit-of-the-bargain they had struck with Dial by buying Dial Complete with a superior efficacy

claim on the label but, in fact, receiving a product that did not provide the promised superior

efficacy.'" 320 F.R.D. at 329.  The Court denied Dial's motion to strike Mr. Boedeker's declaration

as unreliable, and ultimately concluded that "[b]ecause plaintiffs' damages calculation appears

capable of reliably isolating the pertinent price premium and establishing the full extent of damages

on a class-wide basis, in a manner consistent with plaintiffs' theories of liability, the model satisfies

the demands of <u>Comcast</u> and Rule 23." *Id*. at 332-33, 335-37.

Plaintiffs have sufficiently demonstrated that classwide damages can be calculated using a

conjoint analysis and that Mr. Boedeker's damages model matches Plaintiffs' theories of liability

under *Comcast*.

### c.    Statutory Damages

GBL§349(h) provides for statutory damages of $50 to each class member for each time a

defendant violated the statute by a sale.  Statutory damages under GBL §349  can be evaluated with

the same generalized classwide evidence discussed above.  *Sykes*, 780 F.3d at 87 ("It is not disputed

that statutory damages under GBL §349 can be assessed on the basis of common proof"); *In re Amla*

---

[76]    *See In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *16 (N.D. Cal. Sept. 14, 2016) (finding conjoint analysis an acceptable methodology of measuring damages associated with a MyFord Touch common defect); *Dzielak v. Whirlpool Corp.*, No. 2:12-89 (KM)(JBC), 2017 WL 6513347, at *21 (D.N.J. Dec. 20, 2017) (finding conjoint analysis sufficient to measure price premium associated with Energy Star Label on Whirlpool washing machines); *Khoday*, 2014 WL 1281600, at *10 (finding conjoint analysis sufficient methodology sufficient to find common damages stemming from Defendants' misrepresentations about "download insurance"); *Brown*, 2014 WL 6483216, at *19 (conjoint model could calculate common excess profits Defendant made over allegedly false "organic" labeling); *Microsoft v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wa. 2012) (finding conjoint survey could show consumer demand for Microsoft Xbox patented features).

*Litig.*, No. 16-CV-6593 (JSR), 2018 WL 5318420, at *9 (S.D.N.Y. Oct. 29, 2018) ("The Court notes that the damages methodology proposed by plaintiffs - multiplying the number of New York purchases of the product by $50 - is quite reliable, since NYGBL §349 provides for statutory damages. That is sufficient to 'establish[ ] that damages are capable of measurement on a classwide basis.'"). Damages under GBL §349 do not require individualized damages inquiries or expert testimony:

> Under N.Y. G.B.L. §349(h), a plaintiff can recover statutory damages in the amount of $50 upon a finding that the plaintiff has suffered injury. . . . Therefore no expert testimony demonstrating the existence of a measurable impact on [the mislabeled product's] market price is necessary to award relief to the New York class. Moreover, because awarding classwide relief only requires that a fixed amount of statutory damages be granted to each class member, no individualized damages inquiries are necessary for the New York class.

*Guido v. L'Oreal, USA, Inc.*, No. CV 11-1067-CAS (JCx), 2013 WL 3353857, at *16 (C.D. Cal. July 1, 2013); *see also Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 309 (S.D.N.Y. 2009) ("Defendant claims that the [Federal Odometer Act claim] should be dismissed because plaintiff suffered no actual damages. But this is a silly argument; one can never have no damages for violation of a statute that provides for statutory damages.").

Plaintiffs and class members are entitled to actual damages or $50 per violation under §§349, whichever is greater, and can establish injury and damages based on the same common proof. *See supra* §IV.C., p. 16-17; *Scotts*, 304 F.R.D. at 409-10 (finding that classwide evidence can be used to determine whether plaintiffs were injured and suffered economic harm under §349); *Ebin*, 297 F.R.D. at 568-69 (granting certification of §349 claim and finding common injury susceptible of classwide proof when plaintiffs received "an inferior product different from that which the consumers purchased"); *In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) (finding GBL claims susceptible to classwide proof).

### d.    "Value Adjustment" of the Defective Cavities

Another methodology available for proving classwide damages is the "value adjustment" set forth by Wolf's appraisal expert R. Lee Robinette.[77]  Wolf retained Mr. Robinette to provide an "opinion of the value of used residential Wolf ovens containing a porcelain oven cavity."[78]  In doing so, Mr. Robinette provided the following statement:

> . . . if I were appraising two ovens that were otherwise identical and one had small scratches and one did not, I would likely make a slight adjustment to the one with scratches and value it lower than the one without.  In this situation, ***the value adjustment would not exceed 5% to  10% of the total oven value*** and could be less than that in the case of a higher valued oven.[79]

According to Wolf's own expert, the decreased value associated with "crazing or small scratches" in Wolf's oven cavities (*i.e.*, the Defect) is 5% to 10% of the total oven value.  Given the pricing and sales information readily available to Plaintiffs,[80] and taking the median value provided by Mr. Robinette, Plaintiffs can calculate classwide value adjustment damages based on common proof and a simple mathematical calculation.

### e.    Full Compensatory Damages

Plaintiffs and class members are entitled to a full recovery of the purchase price of their Wolf Ovens because they did not receive the product for which they bargained.  Courts in this Circuit and others regularly certify classes of purchasers where damages models are based on full compensatory damages.  *See Scotts*, 304 F.R.D. at 412-13; *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014); *Khoday*, 2014 WL 1281600, at *32.  Wolf's aesthetics, cooking ability and self-cleaning feature are integral to the Wolf Ovens.[81]  Because the "durability of the porcelain may affect the

---

[77]    *See* Ex. 20, CEA Report at 13.

[78]    *Id.* at 1.

[79]    *Id.* at 13.

[80]    *E.g.*, Ex. 2 at WOLF1208857-976; *see also* Ex 58 at WOLF128906 (2016 Price List); Ex. 50, WOLF 0259626.

[81]    *E.g.*, *supra* §II.B., p. 3-4; Ex. 59 at WOLF0196539.

functionality of the oven," and because "[a]fter using the self-clean function, porcelain pieces may fly onto the food," Plaintiffs and class members may be prevented from using their ovens at high temperatures.[82]  Indeed, Plaintiffs have testified that they do not run, or are hesitant to run, the self-cleaning function out of fear of further damaging their oven cavities.[83]  Therefore, under a damages framework awarding full recovery, classwide damages are easily calculated via simple mathematics as the average retail purchase price per oven multiplied by the number of ovens sold.

### B.      Class Litigation Is Superior to Other Methods of Adjudication

Superiority is analyzed by the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).  Counsel is aware of no other related pending litigation, and class members are unlikely to pursue individual claims because of the modest amount of available damages.  *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013) (class action warranted where "cost of litigation would dwarf any potential recovery").  At the Court's direction, Plaintiffs are happy to submit additional briefing, which could include a Proposed Trial Plan and Proposed Jury Verdict Forms, to demonstrate how a trial of this case can be conducted with no manageability concerns.

## VI.      THE PROPOSED CLASSES ARE ASCERTAINABLE

Courts in the Second Circuit, in the context of determining whether to certify a class, recognize an "'implied requirement of ascertainability.'" *See, e.g.*, *Ebin*, 297 F.R.D. at 567 (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)).  "The standard for

---

[82]   *See* ECF No. 35 at 19-19.

[83]   Ex. 43 at WOLF1353369; Ex. 22 at Rinehart Ex. 54 at WOLF0115092; Ex. 17, F. Sharp Tr. at 25:23-26:25.

ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" *Id.* (quoting *Gortat v. Capala Bros., Inc*., No. 07-CV-3629 (ILG), 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010)); *see also id.* at *2 (the standard for ascertainability is not rigorous).  "Ascertainable" is defined "by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Elkind*, 2017 U.S. Dist. LEXIS 24512, at *32 (citing *Brecher v. Republic of Arg*., 806 F.3d 22, 24 (2d Cir. 2015); *see also In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig*., 209 F.R.D. 323, 337 (S.D.N.Y. 2002) (the class must be "identifiable" such that "it can be identified through reference to objective criteria"); *Enzo Forcellati v. Hyland's Inc*., No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *8 (C.D. Cal. Apr. 9, 2014) (quoting same).

The mere fact that class members might not have retained proof of their purchases of the Wolf Ovens will not render the classes unascertainable.  *See Scotts*, 304 F.R.D. at 407-08 ("Declining to certify classes when consumers are likely to lack proof of purchase 'would render class actions against producers almost impossible to bring.'"); *Ebin*, 297 F.R.D. at 567 (finding nationwide class of olive oil purchasers ascertainable even though they were unlikely to have proof of purchase).  Critically, although an effort to identify class members must be made "at some point in the case," there is no requirement that any class members, other than the named class representatives, be identified prior to class certification. *See, e.g.*, *Noble v. 93 Univ. Place Corp*., 224 F.R.D. 330, 341-42 (S.D.N.Y. 2004); *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 66 (E.D.N.Y. 2015) ("'[c]lass members need not be ascertained prior to certification, but the exact membership of the class must be ascertainable at some point in the case.'"); *In re MTBE*, 209 F.R.D. at 337 (same).

Here, the classes consist of a nationwide class and New York and Pennsylvania sub-classes. This is sufficient to satisfy the ascertainability requirement. *See Scotts*, 304 F.R.D. at 407-08 (citing cases). There is nothing subjective about the class definitions as individuals either purchased the product or not. The location of the purchase is an objective fact. Moreover, whether a class member owns a Wolf oven with a blue porcelain cavity is readily ascertainable. In fact, Plaintiffs have already uncovered several methods to identify class members. Because Wolf ovens are exclusively sold by Wolf authorized retailers, Wolf has direct access to sales and customer records. Irrespective of the availability of sales records and the identity of purchasers through Wolf's authorized retailers, ascertainability is routinely satisfied in consumer class actions involving appliances. *E.g.*, *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *21. It is administratively feasible to identify class members by reference to these criteria. *See In re MTBE*, 209 F.R.D. at 337.

The "class action device is, at its very core, designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual lawsuit." *Ebin*, 297 F.R.D at 567. It would be particularly unjust for theoretical manageability concerns to pose an obstacle to class certification here. Without class certification, Defendant will retain the profits related to its false advertising and omission of the imperfections in the Wolf Ovens and thus, will be incentivized to repeat its illegal conduct. Hypothetical concerns about the manageability of this action pale by comparison to concerns about the actual fraud that Defendant has already committed.

## VII.   THE REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(b)(2) ARE READILY MET

The injunctive relief sought by Plaintiffs here is simple and straightforward: Wolf should stop promoting and marketing its pristine blue oven cavities. Or, at a very minimum, it should warn customers that the crazing [imperfection] is likely to, or could, occur through regular use of the

ovens.  In a forceful bit of testimony, witness Mrs. Sharp was asked whether a full refund of the price of the Wolf oven would be sufficient compensation for her, and she said that in her opinion that would not be enough to satisfy the *Sharp* action.[84]  She said injunctive relief was a critical facet of the claims brought on behalf of the absent members.[85]

Class certification under Rule 23(b)(2) is met where plaintiffs can establish "that defendants 'acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Elkind*, 2017 U.S. Dist. LEXIS 24512, at *36-37 (quoting *Davis v. City of New York*, 296 F.R.D. 158, 165 (S.D.N.Y. 2013).  The Supreme Court in *Wal-Mart* explained that:

> When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident.

131 S. Ct. at 2558; *see also Hernandez v. AutoZone, Inc*., 323 F.R.D. 496, 504 (E.D.N.Y. 2018) (certifying a (b)(2) class where the "injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole").  Here, the representations on the ovens at issue are displayed uniformly to all putative class members, and plaintiffs alleged both Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages , respectfully.  Certification of a (b)(2) injunctive class is, therefore, warranted.  *Mayhew*, 2018 WL 3122059, at *6.

---

[84]  Ex. 54, L. Sharp Tr. at 68:20-69:25.

[85]  *Id*. at 62:3-63:23 (noting that Wolf should have disclosed that "there is a chance that when you clean this oven you're going to be disappointed because it's going to pit.  And given us an opportunity to decide if we wanted to take that risk or not.").

## VIII.   THIS IS NOT A PRODUCTS DEFECT CASE

For the purposes of this motion, and to avoid further confusion by Defendant on this point, Plaintiffs use the terms "imperfections" or "blemishes" as descriptors for the cracking or crazing and/or corresponding flaking and/or spidering of Wolf's porcelain oven interiors.   Plaintiffs previously used the word "defect," which is generally defined as a shortcoming or imperfection, for descriptive purposes only – not as legal definition – to describe the manifestation of the imperfections or blemishes in Wolf's oven cavities.  To be clear, however, while the imperfections or blemishes are in fact defects by definition, and  Defendant's own witnesses and porcelain reference materials use the term "defect" to describe the imperfections at issue,[86] this is not a products defect case in the traditional sense of the legal term (*e.g.*, a products liability case).  This case arises from visible imperfections[87] that appear on Wolf's oven cavities and the use of the word "defect" was not intended to convert this case from a false advertising/failure to warn case (which it is) to a products liability or defect case (which could have been pled that way, but was not).[88]

## IX.   CONCLUSION

For the above reasons, Plaintiffs ask that the Court certify each class, appoint Plaintiffs as class representatives of their respective classes, and appoint Robbins Geller and Miller Law as class counsel.

---

[86]   *See*, *e.g.*, Ex. 4, Rinehart Tr. at 72:9-25; Ex. 33, Pltfs. Ex. 16, at WOLF 0017708.

[87]   Defendant's own witnesses have also used the term "imperfections" to describe the porcelain blemishes at issue here.  *See* Ex. 60, Hammond Tr. at 10:12-21.

[88]   *See In re Arris Cable*, 2018 WL 3820619, at *10 ("Although Defendant is correct that Plaintiffs' theory of the case relies on four alleged defects in the Modem, Plaintiffs do not use the term 'defect' in the same sense that the term is used in a personal injury products liability case.  Rather, Plaintiffs use the term 'defect' to identify the causes of the Modem's alleged subpar performance.") (internal citation omitted).

DATED:  December 7, 2018                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            MARK S. REICH
                                            VINCENT M. SERRA

                                                  */s/ Mark S. Reich*
                                            MARK S. REICH

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com
                                            mreich@rgrdlaw.com
                                            vserra@rgrdlaw.com

                                            *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such public filing to all counsel registered to receive such notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 7, 2018.



/s/ Mark S. Reich
MARK S. REICH